**STATE of Minnesota, Respondent,**

v.

**Brian Alexander CLIFTON, Appellant.**

**No. A03–1964.**

Supreme Court of Minnesota.

Aug. 4, 2005.

---

Lawrence Hammerling, State Public Defender, Suzanne M. Senecal–Hill, Assistant Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Patrick C. Diamond, Sr., Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Appellant Brian Alexander Clifton was convicted, following a jury trial in Hennepin County District Court, of premeditated first-degree murder for the shooting death of Steven Earl Nix and sentenced to life imprisonment. On appeal, Clifton asserts he was denied a fair trial by the admission of evidence that a state's witness had been threatened after testifying at an earlier trial, the submission of a no-adverse inference jury instruction and prosecutorial misconduct in closing argument. By pro se supplemental brief, Clifton makes additional claims. We affirm.

In February 2002, Steven Nix was charged with attempted murder in connection with the shooting of Clifton's brother Victor at a party in North Minneapolis. Following a jury trial in June 2002, Nix was acquitted. On the day the jury returned the verdict, Clifton and his family met with the Nix trial prosecutor and victim advocate outside the courtroom. Clifton was very angry. As the prosecutor explained that the criminal case was over, Clifton made some comments, the gist of which was that "this could be taken care of some other way." Clifton was also overheard swearing that he was "going to kill" or "get" Nix. Over the summer of 2002, Clifton was seen making threatening gestures towards Nix when they crossed paths in the Tangletown neighborhood of North Minneapolis.

On September 23, 2002, at around 7:00 p.m., Nix and his friend Darryl Neal were parked on a residential street in Tangletown, "hanging out" in Neal's 1987 GMC Jimmy. Neal was in the driver's seat and Nix was in the front passenger's seat with the window down. Neal had been smoking marijuana and Nix had been drinking cognac. Neal's friend Calvin Combs, who had asked for a ride to another part of town to purchase some marijuana, was in the cargo area working on a mechanical problem with the rear window.

Clifton and his cousin Claudell Walker were also in the area, and as Walker approached Clifton to ask if he could borrow Clifton's car, Walker saw Clifton walk up to the GMC Jimmy and shoot Nix in the head. The gun jammed when Clifton tried to fire another shot. Neal jumped out of the vehicle to determine if he'd been hit and Combs jumped out the back window. Neal then got back into the vehicle, found Nix unresponsive and bleeding from the head, and immediately drove him to North Memorial Hospital.

Hospital personnel took Nix into the stabilization room where he remained unconscious, had no response to stimulation and was having difficulty breathing. A CT scan showed that a bullet had entered Nix's brain on the right side and exited on the left, causing life-terminating injury. Nix was pronounced dead at 8:00 p.m. An autopsy showed that the bullet lacerated the brain and fractured the skull. Stippling near the bullet's entry point indicated that the gun had been fired at close range, between a few inches to two or three feet.

The police spoke with Neal at the hospital and at the Fourth Precinct. Neal identified Clifton from a photo display, stating "[t]hat's him, that's your shooter." Neal also told the police that another man had walked by the vehicle shortly before the

shooting and identified Walker from another photo display. The police eventually located Walker and Combs, both of whom identified Clifton as the shooter.

Clifton was indicted by grand jury for first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2004), and second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2004). Clifton's case initially came on for trial in March 2003 but ended in a mistrial when the jury was unable to reach a verdict. Clifton's case came on for retrial in September 2003. The jury found Clifton guilty of first-degree premeditated murder, and he was sentenced to life in prison with eligibility for parole after 30 years. This appeal followed.

## I.

■ Clifton asserts prejudicial error in the admission of evidence that one of the state's witnesses had been assaulted in retaliation for his testimony at Clifton's first trial. Prior to the first trial, Walker told the police and the grand jury that he saw Clifton shoot Nix. At trial, however, on the morning of March 17, 2003, Walker testified that he was not close enough to see the shooter. In the afternoon, Walker recanted the recantation, explaining that he was nervous and stating that he saw Clifton shoot Nix. Four days later, Walker was assaulted by Clifton's brother Victor, Antonio Jones and David Robinson. At the second trial, over objection, the state was allowed to elicit testimony about the assault to explain the inconsistencies in Walker's prior testimony.

■ We review the district court's evidentiary rulings under an abuse of discretion standard. *Bernhardt v. State*, 684 N.W.2d 465, 474 (Minn.2004). "Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *United States v. Abel*, 469 U.S.

45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). Evidence of bias "is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id.* Threat evidence "can be relevant to explain a witness' inconsistent statements[.]" *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir.1996).

■ Relevant evidence is, of course, generally admissible. Minn. R. Evid. 402. But even relevant evidence, including evidence of threats, will be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Minn. R. Evid. 403; *see State v. Harris*, 521 N.W.2d 348, 351–52 (Minn.1994). While threats made by third parties may have some probative value in repairing a credibility problem with a witness, such evidence may be "extremely prejudicial" in that the "jury may wrongly assume that the defendant made the threats or that associates of the defendant did so at the defendant's behest." Stephen A. Saltzburg, *Threats: Bolstering or Impeaching*, 19 Crim. Justice 45, 46 (Summer 2004). Direct testimony of threats offered by the prosecution to "boost" the overall credibility in the absence of need can amount to a prejudicial attack on the defendant. *See Dudley v. Duckworth*, 854 F.2d 967, 971 (7th Cir.1988) (suggesting that the prosecutor introduced threat evidence to prejudice the defendant rather than explain away credibility problems with the witness). Even when evidence of threats is admissible, we believe "the trial court must still provide safeguards including cautionary instructions to prevent the evidence from being misused." *Harris*, 521 N.W.2d at 353.

Here, in ruling on the admission of the evidence of the assault on Walker, the

district court restricted the use of the evidence to redirect examination for purposes of repairing the credibility problem brought about by defense counsel's cross-examination regarding the inconsistent testimony at the first trial. Walker testified that his assailants accused him of being a "snitch" and asked, "why did you tell" on Clifton? The evidence was also accompanied by the following cautionary instruction:

> Ladies and gentlemen, testimony regarding [an] incident involving Mr. Walker and three other individuals will be received at this time for a limited purpose relating to the assessment of Mr. Walker's credibility.

> The evidence is admitted for the purpose of assessing testimony regarding Mr. Walker's state of mind when he testified at a hearing on March 17, 2003.

A similar instruction was provided again during final jury instructions. Under these circumstances, we conclude the admission of the evidence was not an abuse of discretion.

## II.

■■■ Clifton also asserts prejudicial error in the submission, without his permission, of CRIMJIG 3.17, which instructs the jury not to draw any adverse inference from the defendant's decision not to testify.[1] We have made clear that CRIMJIG 3.17 should not be given without the personal and clear consent of the defendant. *State v. Darris*, 648 N.W.2d 232, 240 (Minn.2002) (holding that it was error to give the instruction without getting the defendant's permission on the record and

citing *State v. Thompson*, 430 N.W.2d 151, 153 (Minn.1988)). Here, no record was made of Clifton's consent to the submission of the jury instruction. But Clifton's decision not to testify was placed on the record, as was his acknowledgment that no adverse inference could be drawn from his failure to testify and that he could request or decline a no-adverse-inference instruction. The record further reflects that Clifton and defense counsel had discussed the instruction and were going to confer again before the jury instruction conference. That conference, which was not recorded, resulted in the inclusion of a proposed no-adverse-inference instruction for the final instructions and the oral assent of both counsel to the final instructions was placed on the record before the instructions were given. At the conclusion of the final charge to the jury, when asked if there were any errors, omissions or corrections that should be called to the court's attention, both counsel said "No, Your Honor." Our independent review of the record satisfies us that Clifton and his attorney agreed to the instruction. Clifton is not entitled to a new trial on this ground.

## III.

■■■ Clifton's third claim is that the prosecuting attorney engaged in misconduct in closing argument. A reviewing court first examines the challenged conduct to determine whether the prosecutor committed misconduct. *State v. DeRosier*, 695 N.W.2d 97, 106 (Minn.2005) (citing *State v. Ford*, 539 N.W.2d 214, 228 (Minn. 1995)). This court will grant a new trial

---

1. The pattern jury instruction on a defendant's right not to testify provides:

   The State must convince you by evidence beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant has no obligation to prove innocence. The defendant has the right not to testify. This right is guaranteed by the federal and state constitutions. You should not draw any inference from the fact that the defendant has not testified in this case.

   10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides–Criminal*, CRIMJIG 3.17 (4th ed.1999).

only when "the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003) (citing *State v. Johnson*, 616 N.W.2d 720, 727–28 (Minn.2000)). We also retain, under our supervisory power, the right to grant a new trial "prophylactically or in the interests of justice," without a further determination of prejudice. *DeRosier*, 695 N.W.2d at 106 (quoting *State v. Salitros*, 499 N.W.2d 815, 820 (Minn.1993)). The injection of racial and socio-economic considerations is improper. *State v. Ray*, 659 N.W.2d 736, 747 (Minn.2003) (holding that the prosecutor engaged in misconduct in closing argument by inviting the jury to consider that the "hood" of North Minneapolis was the defendant's environment, a world wholly outside the jury's own).

In her closing argument in which she urged the jury to find Clifton guilty of premeditated murder, the prosecutor told the jury:

> In preparing these remarks I thought about you as jurors and how different your lives may be from the lives and the lifestyles of many of the people who testified before you and from the victim, Steven Nix.

> And how could you transport yourself to the world of the streets in Tangletown, a world where people gather on the neighborhood block and hang out. They look for action. They recognize people by sight, know them only by nickname, [do] a little drinking, find some marijuana, smoke a little marijuana, see who is partying, see who's hanging. I'm not saying that that's the life of everybody in that area, of course. But there are some folks who do go there and hang out.

> It's a world, at least to some extent, where some people don't trust the system and don't call the police when they see somebody with a gun. They don't run from trouble but almost seem to flirt with it or at least co-exist with it.

> * * * *

> It may be a different lifestyle and different world, but it's a world where many of the witnesses in this case reside. It's their reality.

> * * * *

> The witnesses who saw Steven Nix get murdered * * * deserve the same consideration as any other person, the same standards, the same rules, the same consideration. They [may] look different, they may perhaps sound different. Their lifestyles may be perhaps different, it doesn't matter.

> For a moment they stepped out of their world where justice is dispensed on the street and came into this courtroom and they put their trust and they put their faith in this system because it was the right thing to do.

> * * * *

> You know, it would be nice when you're preparing a case for trial, if you were able to call up a movie studio and call up central casting and say, "Say, I need a couple of witnesses for my trial and could there be a nun and could there be a firefighter and maybe a minister? Could you throw in some people that would be just so believable by who they are?" But that's not reality.

> The reality is you have to go to the people who are there at the time, who saw what they saw. Those are the people who are your witnesses, the people who were at this incident.

> They may have different lifestyles and perhaps sometimes different ways of phrasing things and perhaps different reactions to events that some of you may have.

> * * * *

So they came to the police in three different ways and there are three people who stepped out of their world, the world of perhaps street justice, if you will, and came in here and decided to participate in the system. Three people who showed by their actions in this case that they want the violence to stop.

■■■■ These remarks were improper in at least three aspects. First, the remarks bordered on injecting issues broader than the guilt or innocence of the accused. *See, e.g., State v. Clark*, 296 N.W.2d 372, 377 (Minn.1980) (holding that it was improper for prosecutor to suggest that the defendant should be convicted because of the crime problem in general). Second, the remarks came close to appealing to passion and prejudice. *See, e.g., State v. Johnson*, 324 N.W.2d 199, 202 (Minn.1982) (stating that it was improper for the prosecutor to suggest that jurors put themselves into the victim's shoes). Third and more importantly, these remarks were demeaning. And it didn't help when, in response, defense counsel referenced the witnesses as part of a "broad society" that's "like a bell curve." "Above all, demeaning references to racial groups compromise the right to a fair trial by inviting the jurors to view a defendant as coming from a different community than themselves." *Ray*, 659 N.W.2d at 747 (quoting *State v. Varner*, 643 N.W.2d 298, 304 (Minn.2002)).

Our decision in *Ray* was filed on April 17, 2003. Trial in the instant case commenced on September 8, 2003. The record reflects that the parties were aware of the *Ray* decision and, in fact, the court made evidentiary rulings in line with *Ray*.[2] So it is with some dismay that we are looking at the same kind of closing argument out of the same county attorney's office, but one in which defense counsel acquiesced.

■■■■ The state argues that the prosecutor's closing argument was not calculated to cause the jury to decide the case on the basis of passion or prejudice rather than reason, and the closing argument when read as a whole bears that out. Nevertheless, where race is irrelevant, "racial considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible." *Varner*, 643 N.W.2d at 304. Furthermore, "[j]ustice is a process, not simply a result. Where the prosecution persists in skirting our rules and disregarding our admonitions, we are left with no option but to reverse." *State v. Lefthand*, 488 N.W.2d 799, 802 (Minn. 1992). We have made clear on a number of occasions that in appropriate cases, we will exercise our power to reverse prophylactically or in the interests of justice. *See, e.g., Salitros*, 499 N.W.2d at 820. In this case, however, where unlike *Ray*, there was no explicit reference to race or use of race to disparage the defendant, the argument had a basis in the record and Clifton otherwise received a fair trial, we conclude that the interests of justice does not demand a new trial.

## IV.

By pro se supplemental brief, Clifton claims that the state's examination of Walker was improper, that double jeopardy principles barred retrial, that the standard instruction on jury unanimity was unconstitutional and that the evidence was insufficient to support the verdict.

---

**2.** In accord with *Ray*, the district court granted defense counsel's motion to strike a question of an investigating officer that tended to implicate racial and socio-economic concerns and thereafter allowed only limited inquiry into the officer's difficulty in locating witnesses.

Clifton contends that the state violated his due process right to a fair trial by eliciting testimony from Walker in a manner that characterized Walker as a liar. Clifton relies on a line of cases from federal courts that prohibit a prosecutor from eliciting testimony from one witness that another witness has lied. *See, e.g., United States v. Fernandez,* 145 F.3d 59, 64 (1st Cir.1998); *United States v. Richter,* 826 F.2d 206, 208 (2d Cir.1987). We have not adopted a "blanket" prohibition of "were they lying" questions, although such questions have no probative value and are generally improper. *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999). But the prosecutor did not ask such questions and Clifton's reliance on these cases is misplaced.

■ Clifton also argues that the Double Jeopardy Clauses of the state and federal constitutions barred his second trial. Retrial following the discharge of a hung jury, however, does not violate double jeopardy. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

Clifton further claims that the submission of the standard jury charge regarding unanimous verdicts in criminal cases[3] violated his due process rights under the state and federal constitutions. This claim has no merit.

■ Finally, Clifton asserts that the evidence was insufficient to support his conviction. Specifically, he contends that the evidence failed to establish beyond a reasonable doubt that he committed the crime. Our review of a sufficiency of the evidence claim is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Fields,* 679 N.W.2d 341, 348 (Minn.2004) (quoting *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989)).

Here, there was ample evidence as to Clifton's identity as the shooter, including eyewitness accounts. Neal testified that at the moment he heard the gunshot, he turned and saw Clifton holding a gun at the open window on the front passenger side of the vehicle. Walker and Combs testified that they saw Clifton shoot Nix. Neal and Combs testified that Clifton tried to fire another shot but the gun jammed. Other witnesses described the threats Clifton made outside the courtroom after Nix was acquitted of the attempted murder of Clifton's brother: that Clifton swore he was "going to kill" or "get" Nix. There was also evidence that in the summer of 2002, Clifton was seen "slightly brandishing" a gun in Nix's presence, indicating "just wait, you'll see." In addition, there was expert medical evidence that Nix died from a single gunshot wound to the head, inflicted from close range. When viewed in the light most favorable to the verdict, the evidence clearly supported the verdict.

Affirmed.

**3.** The instruction on jury unanimity provides:
    In order for you to return a verdict, whether guilty or not guilty, each juror must agree with that verdict. Your verdict must be unanimous.
    You should discuss the case with one another, and deliberate with a view toward reaching agreement, if you can do so without violating your individual judgment. You should decide the case for yourself, but only after you have discussed the case with your fellow jurors and have carefully considered their views. You should not hesitate to reexamine your views and change your opinion if you become convinced they are erroneous, but you should not surrender your honest opinion simply because other jurors disagree or merely to reach a verdict.

PAGE, Justice (dissenting).

I respectfully dissent. Because the state was aware of our decision in *Ray* at the time of trial, and because we are looking at "the same kind of closing argument out of the same county attorney's office," I would, in the interests of justice, reverse and remand for a new trial.