STATE of Minnesota, Respondent,

v.

Wambli S. McARTHUR, Appellant.

No. A06–853.

Supreme Court of Minnesota.

April 12, 2007.

46

Benjamin Jon Butler, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, Saint Paul, MN, J. Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

HANSON, Justice.

Appellant Wambli S. McArthur appeals his conviction for first-degree, premeditated murder. McArthur argues (1) the evidence is insufficient to establish premeditation; (2) the testimony of witnesses' fears of him was erroneously admitted; and (3) the prosecutor committed misconduct during closing argument. In his pro se supplementary brief, McArthur argues that an order prohibiting his attorney from discussing witnesses' identities with him until seven days before trial was improper and prejudicial. For the reasons discussed below, we conclude the evidence is sufficient to support a guilty verdict, the district court did not abuse its discretion in admitting evidence of witnesses' fears of McArthur, and the prosecutor did not commit misconduct during closing argument. In addition, we deny McArthur's pro se claim without prejudice, as a postconviction proceeding is the proper forum for his claim.

On the night of June 22–23, 2005, a number of individuals relaxed outdoors in a courtyard area of "Cluster Seven" of the Little Earth Housing Project in South Minneapolis. At about 12:30 a.m., two men walked up to the courtyard-facing patio of the unit located at 2515 Cedar Avenue South where Vincent LaRoque had been conversing with several acquaintances. One of these men approached LaRoque from behind and shot him in the head with a handgun. The two men, as well as a number of bystanders, quickly left the scene. LaRoque was taken to a hospital, where he died from the gunshot wound several days later. An autopsy revealed that the gunshot wound had been inflicted from a distance of about 12 inches or less.

The police investigation yielded only a single piece of metal that may or may not have been the bullet that passed through LaRoque's head. No shell casings were located at the scene. No weapon was found. A grand jury indicted McArthur on one count of first-degree murder in violation of Minn.Stat. § 609.185(a)(1) (2006) and on one count of second-degree murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2006).

Before trial, the district court, pursuant to a motion by McArthur, ordered the state to refrain from introducing evidence related to McArthur's alleged gang affiliation. In addition, the court declined to admit evidence of McArthur's prior convictions, either as *Spreigl* evidence or for impeachment purposes, reasoning that the convictions were unduly prejudicial and insufficiently probative. But the court also ruled, over McArthur's objection, that witnesses would be permitted to testify about their fears of McArthur, McArthur's family, and McArthur's friends. The court did not limit this testimony to redirect examination and did not specify that any foundation would be required before it could be admitted. The court reasoned that this evidence was relevant to witness credibility and may help explain any reluctance the

witnesses may have had to come forward with information against McArthur. Many witnesses did ultimately discuss their fear of McArthur. McArthur failed to request a cautionary instruction concerning this testimony, and no cautionary instruction was given.

At trial, the testimony of multiple witnesses implicated McArthur as the man who shot LaRoque. For example, two persons had been with LaRoque on the patio and witnessed the shooting at very close range. One of those persons identified McArthur as the shooter, and she said McArthur "was just staring at Vincent" as he approached and did not speak to anyone on the patio. The second person said she believed the shooter resembled McArthur, though she did not get a good look at the shooter's face. A third person left the patio shortly before the shooting, and he said he saw two persons, one matching McArthur's description, approach the patio just before LaRoque was shot.

Two other witnesses were close ·by at the time of the shooting. A girl standing just outside the patio of a neighboring unit saw two men walk up behind LaRoque. She observed one of the men pointing at LaRoque as they approached, and she said the other man "got behind him and then he shot him" with a revolver. She named McArthur as the shooter, and she said she heard two shots. A man who had been on the patio of another neighboring unit testified that he saw two men approach LaRoque, and he said one man, fitting McArthur's description, was carrying a revolver. He said he heard a gunshot followed by a pause and then two more gunshots, perhaps from a different gun.

Two individuals were on a basketball court about 74 feet north of the patio at the time of the shooting. One picked McArthur's photograph out of a photo lineup on June 23 and testified that McArthur fired two shots at LaRoque. The other said she saw two men, one fitting McArthur's description, walk towards LaRoque shortly before she heard several gunshots.

One witness was looking out a window of a unit in Cluster Seven into the courtyard just before the shooting. From approximately 70 feet away, she thought she saw McArthur and another man standing near unit 2515. She heard loud talking followed by two gunshots several seconds apart. She identified McArthur in a photo lineup.

Two additional witnesses were in a parking lot south or southeast of the patio where LaRoque was shot. They testified that they heard a gun fire and then saw McArthur and another man fleeing from the direction of the patio area.

Another witness lived in a different housing cluster, about 208 feet northeast of unit 2515. From her unit, she saw McArthur and another man walking on a sidewalk near the basketball court toward Cluster Seven. She observed McArthur's companion talking in McArthur's ear and pointing towards unit 2515, and she saw McArthur was holding his pants at the beltline, as though he were carrying a gun or a knife. She went into her house and heard a gunshot, and shortly thereafter she saw the two men in the parking lot, laughing and walking quickly while carrying something wrapped in a shirt. She picked both men out of photo lineups.

Several defense witnesses said McArthur spent June 22 working for a moving company and then had relaxed with his coworkers in Roseville until late evening, but no witness could definitively account for McArthur's whereabouts at 12:30 a.m. on June 23. McArthur did not testify.

On January 25, 2006, the jury returned a guilty verdict on the charge of first-degree, premeditated murder, and McArthur was

sentenced to life imprisonment. McArthur appeals his conviction.

## I.

McArthur challenges the sufficiency of the evidence regarding premeditation. More specifically, he argues that there was no evidence of motive or even any indication that McArthur and La-Roque knew each other. He claims that there is minimal evidence of planning activity because, while he was armed, it was not shown that he armed himself just prior to the murder or that he armed himself for the purpose of committing the murder. He further asserts that the evidence about the nature of the murder is insufficient to support a finding of premeditation, arguing that an attack from behind is insufficient to show premeditation, and that there was no evidence that he overcame any obstacles to commit the murder which might show a determination to kill.

A person is guilty of premeditated, first-degree murder if he or she "causes the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1). " '[P]remeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2006). Neither a specific period of deliberation nor evidence of extensive planning is required to prove premeditation, but "the state must prove that some appreciable period of time passed after the defendant formed the intent to kill, during which the statutorily required consideration, planning, preparation, or determination took place." *State v. Moua*, 678 N.W.2d 29, 39 (Minn.2004). Because premeditation requires proof of an individual's mental state, it is almost always proved circumstantially. *State v. Leake*, 699 N.W.2d 312, 319 (Minn.2005).

Typically, when the sufficiency of the evidence is challenged, this court reviews the evidence to determine "whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476 (Minn.2004) (citation and quotation marks omitted). But, when a conviction is based solely on circumstantial evidence, that evidence must be "consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt." *Id.* at 477 (citation and quotation marks omitted). "[I]n such cases the circumstantial evidence must do more than give rise to suspicion of guilt; it must point unerringly to the accused's guilt." *Id.* (citation and quotation marks omitted). Nevertheless, this court still recognizes that the jury "is in the best position to evaluate the circumstantial evidence surrounding the crime." *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988) (citation and quotation marks omitted).

Although review for sufficiency of evidence requires consideration of the totality of the circumstances, we typically focus on three types of evidence when reviewing a conviction to determine whether the evidence of premeditation is sufficient. *See Moua*, 678 N.W.2d at 40. First, we consider evidence of planning activity. *Id.* Examples of planning activity include prior possession of the murder weapon or stealthy approach of the victim. *Id.* Second, we consider motive evidence. *Id.* Motive evidence includes threats by the defendant, conduct by the victim known to have angered the defendant, and plans or desires of the defendant that would be furthered by the victim's death. *Id.* at 41. Although evidence of motive is probative of premeditation, motive evidence is not nec-

essary to prove premeditation. *Id.* Third, we consider evidence about the manner of the killing, i.e., whether it "was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *Id.* (citation and quotation marks omitted). This third type of evidence includes the number of wounds inflicted, infliction of wounds to vital areas, infliction of gunshot wounds from close range, passage of time between infliction of wounds, and a defendant's concern with escape rather than with rendering aid to the victim. *Id.* at 41–42.

McArthur is correct that no evidence of motive was introduced. Similarly, the murder itself is the only indication that McArthur and LaRoque may have been acquainted. But there is evidence regarding planning activity. McArthur was armed, and he presumably obtained the gun sometime after he left work, no more than a few hours before the murder. Although McArthur did not have to pursue LaRoque or overcome any specific obstacles, he did have to cross a significant expanse of open ground. *Cf. State v. Amos,* 347 N.W.2d 498, 501 (Minn.1984) (indicating the fact that the defendant armed himself and ran across the street to shoot a victim from close range is evidence of premeditation). Two witnesses testified that McArthur and his companion were speaking as they approached and that McArthur's companion pointed in the direction of the victim. McArthur walked directly up to LaRoque, apparently "staring" at him. Moreover, the evidence regarding the nature of the killing is also

significant. McArthur shot LaRoque from behind, in the head, and from extremely close range. While LaRoque suffered only one wound, there was testimony that multiple shots were fired. McArthur fled the scene following the shooting. We conclude that there was sufficient evidence to support a finding of premeditation.

## II.

 McArthur claims that testimony regarding witnesses' fears about participation in the case was irrelevant and inadmissible. He concedes that such testimony would be relevant to "explain[ ] some major inconsistency in the witnesses' testimony," but he argues that most of the testimony to which he objects was brought out on direct examination, before it was clear the defense would seek to exploit any inconsistencies. McArthur claims the failure of the court to give a cautionary instruction exacerbated the error.

McArthur specifically objects to the testimony of five witnesses.[1] One of these witnesses explained during direct examination that her failure to name McArthur as the shooter when she first spoke to the police was attributable to her fear of McArthur and his family, including McArthur's brother, the father of her children. This same witness also testified that the Minneapolis Police Department paid her $600 for rent because the police wanted to keep her out of public places after she heard that threats had been made against her by her children's father.[2] A second

---

1. While McArthur does not specifically object to them, there are several additional instances of testimony related to witnesses' fears.

2. McArthur argues that this testimony of a purported witness-protection-style arrangement should be treated separately. But we generally analyze evidence of the underlying threat as we do more general evidence of

threats or witnesses' fears, and, even if the rent payment constitutes participation in a witness protection program, evidence about any benefit received by the witness is relevant to credibility. *See State v. Harris,* 521 N.W.2d 348, 351–52 (Minn.1994) (applying Minn. R. Evid. 402 and Minn. R. Evid. 403). Moreover, if this testimony is treated separately, any error should be reviewed under the plain

witness admitted during cross-examination that she did not tell the police that her daughter witnessed the murder, and on redirect examination she explained that she did not name her daughter because her daughter had been afraid and she was not certain her daughter would want to come forward. A third witness, when asked on direct examination why she could not identify the man she saw shoot La-Roque, indicated that she did not get a good look at the shooter and stated "the only people I'm ever around in the projects is my family * * * I don't know a whole lot of people there[,] I mean, you hear names and you hear stories or reputations and stuff." A fourth witness testified during direct examination that she did not sign the statement she gave to the police or the photo of McArthur that she picked out of the photo lineup because she was frightened and did not want anyone to "come after" her. A fifth witness, on redirect examination, denied wanting to testify against McArthur to please LaRoque's family and stated that she did not in fact want to get involved in the case against McArthur because she had concerns about her safety.

■■■■ This court reviews a district court's evidentiary rulings under an abuse of discretion standard. *State v. Clifton*, 701 N.W.2d 793, 797 (Minn.2005). Relevant evidence is generally admissible. Minn. R. Evid. 402. Bias, which may be induced by self-interest or by fear of testifying for any reason, is almost always relevant because it is probative of witness credibility. *See Clifton*, 701 N.W.2d at 797. But even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury." Minn. R. Evid. 403. The district court should be concerned that the evidence of fear is not used to create an inference that a defendant is a bad person who is likely to commit a violent crime. *State v. Harris*, 521 N.W.2d 348, 352 (Minn.1994).

■■■ Recent cases have emphasized that the probative value of evidence of a witness's fears is greatest when offered on redirect examination, in response to attacks on witness credibility. *See State v. Vance*, 714 N.W.2d 428, 441–42 (Minn. 2006); *Clifton*, 701 N.W.2d at 797–98. And evidence of witness fears is most prejudicial when it is an important focus of the state's case. *See Vance*, 714 N.W.2d at 442; *Harris*, 521 N.W.2d at 352. But we have also indicated that it may be appropriate for a party to anticipate a challenge to witness credibility and to attempt to explain expected issues of credibility on direct examination. *Harris*, 521 N.W.2d at 352. Even when introduction of such evidence is proper, we have stressed the need for district courts to provide safeguards, including cautionary instructions, in order to prevent the evidence from being misused. *Clifton*, 701 N.W.2d at 797–98 (approving the use of a cautionary instruction and the restriction of threat evidence to redirect examination); *Harris*, 521 N.W.2d at 353 (holding that the district court erred by not instructing that evidence of threats was admitted solely to show the defendant's consciousness of guilt).

■■■ Weighing the probative value of evidence of threats or fears against the

---

error standard, a standard less favorable to McArthur, because he did not specifically object to evidence of the rent payments. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Because we do not need to determine

if any error was prejudicial and because we hold that the trial court did not err in its evidentiary rulings, we do not differentiate between evidence of the rent payments and evidence of witnesses' fears more generally.

potential for unfair prejudice is a difficult task. Evidence of witnesses' fears of testifying and of purported threats against witnesses both tend to be relevant to general witness credibility or to explain a witness's reluctance to testify or inconsistencies in a witness's story. But the district courts should ensure that *evidence* of fears of or threats by the defendant or others is not used to improperly attack the defendant's character. In addition, while evidence that the defendant made threats against witnesses may be relevant to show the defendant's knowledge of his or her guilt, this inference is inappropriate when the threats cannot be traced directly to the defendant.

■ Furthermore, when evidence of threats or fears is properly admitted, selecting appropriate safeguards is similarly difficult. In most cases in which evidence of threats or a witness's fears may be properly admitted, it will be best to limit a witness's testimony about those threats or fears to redirect examination, after cross-examination has made it clear that such testimony is needed to rebut an attack on the witness's credibility. But such a limit may be improper if it prevents a witness from testifying completely and accurately and in a manner easily understood by the jury. Moreover, in cases where multiple witnesses are likely to be justified in testifying about their fears, it would be unreasonable to require the state to ignore the credibility issues on direct examination and then repeatedly rebut attacks on witness credibility during redirect, and it may be better to permit the state to address the issues on direct examination by inquiring into witness's fears. There may be cases where it will be appropriate to address threats or a witness's fears during direct examination to explain the witness's demeanor or reluctance to respond to the prosecutor's questions.

Because the proper approach will inevitably vary with the context, we cannot give precise guidance as to how evidence of witnesses' fears or threats against witnesses should be handled in every case. Instead, we leave the case-by-case determinations to the discretion of the district courts, trusting them to make sound decisions about the admissibility of evidence of witnesses' fear and to fashion appropriate safeguards in the event such evidence is admitted.

In this case, we agree with the district court's rulings and hold that it did not abuse its discretion in admitting evidence of the witnesses' fears. We note that the issues concerning witness fears arose in the broader context of several items of evidence that could prejudicially discredit McArthur's character. In ruling on each item of proposed evidence, the district court displayed sensitivity to the potential for unfair prejudice. The court excluded evidence related to McArthur's alleged gang affiliation as well as evidence of McArthur's prior convictions. Moreover, some of the testimony of which McArthur complains appears to be clearly unobjectionable. Some of the testimony about a witness's fears was given on redirect examination as an appropriate response to McArthur's cross-examination. Other statements challenged by McArthur were so vague—i.e. references to "stories or reputations and stuff"—that they do not appear to be even an implicit reference to fear of McArthur.

■ Regarding the remaining testimony to which McArthur objects, although the state elicited evidence of witnesses' fears of McArthur on direct examination, the state's questions appear to be designed to preempt attacks by the defense on the credibility of witnesses and to explain inconsistencies in their statements and any delays in coming forward. And, although

multiple witnesses testified about their fears, and the prosecutor mentioned those fears in his closing, the clear focus of the state's case was the ample eyewitness testimony implicating McArthur as the shooter. Finally, while the court could have offered to give a cautionary instruction related to the testimony regarding threats and witnesses' fears, no instruction was requested—perhaps as a matter of strategy—and "[o]rdinarily it is not plain error for the trial court to fail to *sua sponte* give an instruction." *Vance*, 714 N.W.2d at 442–43. Accordingly, the district court did not abuse its discretion by permitting the prosecutor to inquire about witnesses' fears during direct examination.

## III.

 McArthur claims that the prosecutor committed misconduct during closing argument. In his closing, the prosecutor stated the following:

Do you think by [the witness] naming the defendant, things were going to make—be made any easier for [the witness] given the fact she had a child by the defendant's brother? I don't think so. She had fear because of that as to what could happen, what the repercussions would be for her, not only her own safety but the situation with her child.

McArthur asserts this reference to the witness's concern for the safety of her child was something to which the witness did not testify, and therefore was a misrepresentation of the evidence. In addition, at the end of a discussion related to witness credibility, the prosecutor said the following:

When [the witnesses] took that witness stand, did they appear to be enjoying this? Did little [witness] appear to be enjoying this when she cried several times? Did [another witness] seem to be enjoying this being hauled in here

after being arrested for not honoring her subpoena? I don't think so. Were they getting anything out of this? Nothing. Again, there's no motive for them to fabricate anything or engage in a conspiracy with each other. They were afraid to get involved. They were taking a risk, a safety risk.

McArthur contends that the prosecutor was vouching for the validity of the witnesses' fears and inflaming the passions of the jury in this passage.

 It is misconduct for a prosecutor to intentionally misstate evidence or to appeal to the passions of the jury. *State v. Mayhorn*, 720 N.W.2d 776, 786–88 (Minn. 2006). Similarly, a prosecutor should not refer to facts not in evidence or vouch for the veracity of any particular evidence. *See id.* at 788–91; *State v. Swanson*, 707 N.W.2d 645, 656 (Minn.2006). Because McArthur did not object to either alleged instance of misconduct, he must establish that the misconduct constitutes error that is plain. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006).

Regarding the passage about "the situation with her child," the witness clearly testified on redirect examination about her concerns that testifying against the brother of the father of her child would create intra-family conflict. The prosecutor's statement is a fair reference to and characterization of that potential conflict. Consequently, nothing appears to have been misrepresented, let alone misrepresented intentionally.

Regarding the second passage, a witness did testify, during cross-examination by the defense, that her family had been threatened by the man who accompanied McArthur during the murder. Another witness testified about threats against her as well. Arguably, the evidence did establish that some witnesses were taking safety risks and the prosecutor's statement

was a fair characterization of the testimony. Moreover, although the prosecutor perhaps should have prefaced his statement about risk with "the witnesses believe," it was apparent, given the context, that the prosecutor was speaking from the witnesses' perspective. Accordingly, the prosecutor did not commit misconduct during closing argument.

## IV.

Finally, in his pro se supplementary brief, McArthur argues that he was improperly denied adequate opportunity to participate in his defense. Specifically, he objects to a court order that he says restricted his access to information about the witnesses against him until shortly before trial.

Due process requires that defendants be afforded meaningful opportunity to present a complete defense. *State v. Wildenberg*, 573 N.W.2d 692, 697 (Minn. 1998). But the record does not include any written order or a transcript of a verbal order. Thus, it is unclear what the order provided or whether and how McArthur may have been prejudiced by such an order. Because evaluation of this claim appears to require facts not in the record, this issue would be most appropriately raised in a postconviction proceeding. Accordingly, we deny the claim without prejudice to the renewal of it by a postconviction petition.

Affirmed.