STATE OF MINNESOTA

IN SUPREME COURT

A22-0316

Court of Appeals                                                                           Moore, III, J.
                                                        Concurring in part, dissenting in part,
                                                        Anderson, J., Hudson, C.J., Thissen, J.
State of Minnesota,

              Respondent,

vs.                                                                          Filed: May 8, 2024
                                                                   Office of Appellate Courts
Said Sharif Maye,

              Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.       The district court abused its discretion by allowing the admission of evidence on direct examination of anonymous, threatening phone calls a witness received before trial when the minimal probative value of the threat evidence was substantially outweighed by the risk of unfair prejudice that its admission posed to the defendant.

1

2. Because the defendant has not demonstrated a reasonable possibility that the admission of evidence on direct examination of anonymous, threatening phone calls a witness received before trial significantly impacted the jury's verdict, the defendant is not entitled to a new trial.

Affirmed.

O P I N I O N

MOORE, III, Justice.

The questions presented in this case are whether the district court abused its discretion in admitting evidence on direct examination that a witness received threatening phone calls from an unknown caller and, if so, whether any such error was harmless. Appellant Said Sharif Maye was convicted of second-degree unintentional murder for the August 2020 death of Idris Yussuf. Before trial, the district court denied Maye's motion to exclude testimony that the State's main eyewitness received several threatening phone calls before trial telling him not to testify. At trial, the State questioned the eyewitness about the threats at the end of direct examination.

The court of appeals affirmed Maye's conviction and held that the district court did not abuse its discretion in admitting evidence of the threatening phone calls because (1) the evidence was relevant to the witness's credibility, (2) the State's use of the evidence was minimal, and (3) the evidence was admitted with sufficient safeguards to protect against unfair prejudice. *State v. Maye*, No. A22-0316, 2023 WL 2762762, at *3–4 (Minn. App. Apr. 3, 2023). The court of appeals also held that even if the evidence was erroneously admitted, its admission was harmless. *Id.* at *4–5. Although we hold that the district court

abused its discretion by admitting the threat evidence on direct examination, we affirm the decision of the court of appeals because we agree that the admission of the evidence was harmless.

**FACTS**

Following the death of Yussuf outside of a bar in Minneapolis in August 2020, the State charged Maye in an amended complaint with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2022), and second-degree unintentional murder, Minn. Stat. § 609.19, subd. 2(1) (2022). The State alleged that Maye fatally injured Yussuf by striking him with a car after the men interacted at the bar and Yussuf became upset with Maye. The following evidence was presented at the jury trial.

On August 23, 2020, Yussuf and a friend, B.A., drove together to a bar on the corner of Franklin Avenue and Lyndale Avenue in Minneapolis. Maye, who was acquainted with B.A., sat at the table with Yussuf and B.A. on the patio. Throughout the night, tensions rose within the group due to language barriers and derogatory remarks made by Maye about other bar patrons. The three men left just prior to 2 a.m. closing time —B.A. left through the front door and Yussuf and Maye from the patio into the alley.

After taking a phone call, B.A. walked around the corner to where Yussuf's car was parked, facing uphill on Franklin Avenue. B.A. saw Yussuf and Maye walking together in the alley behind the bar, but could not hear if they were speaking and did not see a physical altercation. Yussuf continued walking to his car, and Maye continued further up Franklin Avenue to his car. Yussuf was standing in the street near the driver's side door while B.A. stood on the sidewalk by the passenger's side door. Maye then sped down the street

3

towards Yussuf's car. Maye revved his engine and pinned Yussuf against his car by his abdomen and legs for 5 to 7 seconds. Yussuf's car was pushed onto the sidewalk by the impact and hit B.A., who fell to the ground and bruised his knees. Maye then reversed his vehicle and drove away. Yussuf fell to the side and rolled down the street.

Yussuf was found approximately 22 feet from his vehicle, bleeding from his head, mouth, and nose. First responders arrived shortly thereafter. B.A. was unable to describe Maye's vehicle, but told police that an acquaintance named Said hit Yussuf with his vehicle; an impact which pinned Yussuf against his car and threw him to the ground. Yussuf died from his injuries[1] 2 days later.

Maye, testifying on his own behalf, challenged B.A.'s version of events. According to Maye, Yussuf was smoking marijuana and selling marijuana to other bar patrons from their table. Maye asked him not to smoke and threatened to report him to the bartender. Later that night, Maye ran into Yussuf in the alley after leaving the bar. Yussuf pushed Maye from behind, called Maye a snitch, and threatened him. Yussuf's hands were on his stomach, and Maye thought he might have a weapon. Maye explained to Yussuf that he did not tell the bartender anything and then ran towards his car.

Maye testified that, when he returned to his car, he immediately began backing out of his parking spot and driving away. Yussuf followed him and charged at Maye's car. Maye testified that he saw something metallic in Yussuf's hand and assumed it was a gun.

---

[1] Testimony from Chief Hennepin County Medical Examiner Andrew Baker, M.D., identified numerous injuries to Yussuf's upper body. Dr. Baker concluded that Yussuf's cause of death was the uncontrolled swelling of his brain—a complication of "blunt force craniocerebral injuries due to a pedestrian struck by a motor vehicle."

Maye ducked down in his car to avoid being shot, and Yussuf then jumped on Maye's car in the middle of the street. Maye lost control of the vehicle. When Maye looked up after crashing, he did not see Yussuf and did not know what had happened to him. After seeing B.A. moving towards his car, Maye then reversed and drove away. At a grocery store 3 days after the incident, Maye was threatened by a group of armed men, who accused him of killing Yussuf.

Before trial, Maye moved to exclude evidence that B.A. had received at least two threatening phone calls from unknown numbers telling him not to testify. Maye argued that the evidence should be excluded under Minn. R. Evid. 403,[2] because its probative value was substantially outweighed by the danger of unfair prejudice. Specifically, Maye argued that the phone calls had low probative value and, if admitted into evidence, would allow the jury to make a negative inference that he was involved in the threatening phone calls. In response, the State argued that the evidence was relevant to B.A.'s credibility, showing that he was willing to testify despite threats, and "if he's . . . afraid while he's testifying or if he expresses any fear about being in court and testifying in open court, it might help to explain to the jury why he's maybe testifying poorly." The State did *not* indicate that B.A. had previously expressed fear or reluctance about testifying. The State proposed clarifying on direct examination that B.A. did not know who the calls came from and that he had no reason to believe Maye was involved.

---

[2]    "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Minn. R. Evid. 403.

The district court denied Maye's pretrial motion on the grounds that the threat evidence was admissible on direct examination, and not precluded by Minn. R. Evid. 403. The district court reasoned that the evidence was probative of B.A.'s credibility and that the prejudicial effect of the evidence would be mitigated by the State's suggested clarifying questions. Maye's counsel asked the court to reconsider, stating:

> [T]he problem I have is that who else is it going to be? If the jury believes that those calls were made, it's either Mr. Maye or it's somebody supporting Mr. Maye, and that's going to be prejudicial . . . . We're going to have [B.A.] saying I have no reason to believe it's Mr. Maye, wink, wink.

The district court declined to reconsider the ruling, saying, "Well, and that's the thing, wink, wink would be a problem, [defense counsel], and that would go against my order . . . . So if he can testify to what [the prosecutor] said, then it's allowed." Maye did not request that a clarifying or limiting instruction be given to the jury, and the district court did not provide one.

At trial, the State asked B.A., at the end of direct examination, about the threatening phone calls he had received before trial. B.A. testified that he had received "[p]robably more than six" threatening calls. The following exchange then occurred:

> Q. And you have no reason at all to believe that those calls were from Mr. Maye or done on his behalf, right? There's no reason to think that, right? I mean, you don't personally know that Mr. Maye was on the other end making the threat?
> A. No.
> Q. But somebody called you and essentially told you not to testify; is that true?
> A. Yes.
> Q. And you're here today despite those phone calls, right?
> A. Yes.

Outside of this brief questioning, neither party mentioned the threatening phone calls for the rest of the trial.[3]

The jury found Maye not guilty of second-degree intentional murder and guilty of second-degree unintentional murder, and the district court sentenced Maye to 128 months in prison.

Maye filed a notice of appeal, arguing (1) that the district court abused its discretion by admitting evidence on direct examination of the threatening phone calls that B.A. had received and (2) that this error was not harmless. *Maye*, 2023 WL 2762762, at *3. The court of appeals affirmed. *Id.* at *1. The court held that the district court did not abuse its discretion in admitting the threat evidence because (1) the evidence was relevant to B.A.'s credibility, (2) the State's use of the evidence was minimal, and (3) the district court admitted the evidence with an appropriate safeguard to minimize any unfair prejudice to Maye. *Id.* at *3–4. It also held the admission of this evidence was harmless. *Id.* at *5.

We granted Maye's petition for review.

## ANALYSIS

This case requires us to decide whether the district court abused its discretion in denying Maye's pretrial motion and allowing the State to question B.A. on direct examination about the threatening phone calls he received before trial, and whether any

---

[3]    On cross-examination, Maye did not ask B.A. about the threats, but rather focused on minor inconsistencies in his story. Maye asked B.A. about the fact that he testified at trial that he was drinking on the night of the incident, but told police at the time that he had not been drinking. Maye also questioned whether B.A. knew of Yussuf's alleged drug dealing, which B.A. denied. Lastly, Maye questioned B.A. on why he left the scene of the accident shortly after police arrived.

7

such error was harmless.  We review a district court's evidentiary rulings for an abuse of discretion.  *State v. Clifton*, 701 N.W.2d 793, 797 (Minn. 2005).

I.

Relevant evidence is generally admissible.  Minn. R. Evid. 402.  But even relevant evidence will be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."  Minn. R. Evid. 403.  Evidence relating to a witness's bias, "which may be induced by self-interest *or by fear of testifying for any reason*, is almost always relevant because it is probative of witness credibility."  *State v. McArthur*, 730 N.W.2d 44, 51 (Minn. 2007) (emphasis added).  More specifically, evidence that a witness received threats before testifying or is afraid of testifying is relevant both to general witness credibility and to explain a witness's reluctance or nervousness on the stand or inconsistencies in a witness's story.  *Id.* at 52.  We have stated that the probative value of threat evidence "is greatest when offered on redirect examination, in response to attacks on witness credibility," but have also indicated that "it may be appropriate for a party to anticipate a challenge to witness credibility and to attempt to explain expected issues of credibility on direct examination."  *Id.* at 51.

Maye argues that the district court's denial of his motion to prohibit the State from introducing the threat evidence constituted an abuse of discretion because the evidence was irrelevant.  According to Maye, the evidence was not relevant because (1) there was nothing connecting Maye to the threats, (2) B.A. was not reluctant to testify, and (3) the threat evidence did not explain inconsistencies in B.A.'s testimony.  Maye asserts that because the threat evidence had no probative value, and the prejudicial impact of the testimony was

8

high given the lack of connection between the threats and Maye, the court should not have denied the motion in limine. We agree.

In our prior cases upholding the admission of threat evidence, the evidence was most often elicited to explain major inconsistencies in testimony or clear nervousness. *See, e.g.*, *Clifton*, 701 N.W.2d at 797–98 (considering evidence of retaliation admitted to explain a witness's recantation of his account of the defendant's involvement in the crime); *State v. Vang*, 774 N.W.2d 566, 580 (Minn. 2009) (considering evidence that a witness was threatened to explain the witness's reluctance to testify). In other instances, the threat evidence was admitted because there was clear evidence that the defendant made the threats, therefore showing consciousness of guilt. *See, e.g.*, *State v. Harris*, 521 N.W.2d 348, 353 (Minn. 1994) (finding that evidence of threats of serious harm and death allegedly made by the defendant against three witnesses was properly admitted, but holding that the district court erred in failing to provide a cautionary instruction regarding the threats); *State v. Diggins*, 836 N.W.2d 349, 357–58 (Minn. 2013) (holding that the district court did not abuse its discretion by admitting evidence that the defendant assaulted and threatened a witness 2 days before the trial).

Here, the district court denied Maye's motion in limine and allowed the threat evidence to be admitted on direct examination based on a pretrial proffer from the State. The State posited that the threat evidence would be relevant to B.A.'s credibility because "if he's . . . afraid while he's testifying or if he expresses any fear about being in court and testifying in open court, it might help to explain to the jury why he's maybe testifying poorly." The State also indicated that B.A. did not know who the calls came from. The

9

State did *not* indicate that the threats had any impact on B.A.'s decision to testify or could impact the content of his testimony or that B.A. had any fear of testifying due to the threats. With this record, we conclude that the probative value of the evidence of threatening phone calls was minimal.[4] But based solely on this vague and limited proffer, the district court issued a clear pretrial ruling allowing the admission of the threat evidence on B.A.'s direct examination.

The insufficiency of this proffer—and the substantial risk of unfair prejudice to Maye that the threat evidence posed—becomes more apparent in the context of how the evidence was eventually elicited at trial. Evidence that a witness received threats from third-parties before testifying may be " 'extremely prejudicial' in that the 'jury may wrongly assume that the defendant made the threats or that associates of the defendant did so at the defendant's behest.' " *Clifton*, 701 N.W.2d at 797 (quoting Stephen A. Saltzburg, *Threats: Bolstering or Impeaching*, 19 Crim. Justice 45, 46 (Summer 2004)). As a result, when evaluating the admissibility of threat evidence, "[t]he district court should be concerned that the evidence of fear is not used to create an inference that a defendant is a bad person who is likely to commit a violent crime." *McArthur*, 730 N.W.2d at 51.

---

[4]     The State asks us to conclude that the threat evidence here was probative of B.A.'s credibility broadly, citing to our decision in *McArthur*, where we stated that threat evidence "tend[s] to be relevant to *general witness credibility*." 730 N.W.2d at 52 (emphasis added). Because the evidence of threats in *McArthur* was relevant for reasons other than "general witness credibility," this language is dicta and is not controlling on our decision in this case. *Id.* at 50–53. The State has not cited any cases where we have affirmed the admission of threat evidence on direct examination where the evidence was *only* relevant to the witness's *general* credibility. We decline to follow this language on the facts presented here.

Therefore, the district court must provide safeguards to prevent such prejudice to the defendant, including cautionary instructions when requested. *Harris*, 521 N.W.2d at 353. These safeguards could include deferring ruling on a motion in limine until the witness's testimony at trial makes clear that the threat evidence is more probative than prejudicial.

In this case, there were only minor inconsistencies between B.A.'s trial testimony and his account of the incident given to police, none of which were clearly attributable to the threats. The record does not show that B.A. showed any reluctance, nervousness, or expressions of fear to testify. And there is no indication that the threatening phone calls substantively influenced B.A.'s testimony. Further, when the district court allowed the State to elicit threat evidence from B.A. on direct examination, there had been no attack on B.A.'s credibility and, as such, it was not clear that the threat evidence was necessary to rehabilitate him. Consequently, the district court's denial of Maye's motion in limine allowed the preemptive admission of the threat evidence which was, in effect, an unjustified "boost" to B.A.'s credibility. *See Clifton*, 701 N.W.2d at 797 ("Direct testimony of threats offered by the prosecution to 'boost' the overall credibility in the absence of need can amount to a prejudicial attack on the defendant."). And although the district court—acknowledging Maye's concerns about the risk of unfair prejudice—directed the State to ask B.A. a question clarifying that Maye was not involved in the threats, the State's resultant, awkward compound question on direct examination did not prevent the jury from making this wrongful assumption.

For the reasons stated above, we hold that the district court abused its discretion by denying Maye's motion in limine and thereby admitting evidence on direct examination of

11

anonymous, threatening phone calls that B.A. received before trial when there was no evidence connecting the defendant to the threats, there was no indication that the witness would express fear or reluctance to testify, and any inconsistencies in the witness's story were minor and unattributable to the threats.

## II.

Having concluded that the district court abused its discretion by permitting the admission of evidence on direct examination that B.A. received threatening phone calls, we next turn to the question of whether this abuse of discretion requires reversal of Maye's conviction, or if it was harmless error. *See State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011); *State v. Jaros*, 932 N.W.2d 466, 472 (Minn. 2019). Maye argues that B.A.'s testimony about the threatening phone calls was highly prejudicial because the State did not establish *why* the threats were relevant to his credibility, leaving the jury to infer that Maye was involved in the threatening calls and that this involvement showed consciousness of guilt. Furthermore, because the lack of injuries to the victim's lower body could be at variance with B.A.'s testimony of how the victim was pinned against Maye's car,[5] Maye suggests that improper bolstering of B.A.'s credibility through the threat evidence impacted the jury's verdict.

Maye is not entitled to a new trial unless the district court's error was prejudicial. *State v. Williams*, 908 N.W.2d 362, 365 (Minn. 2018). Because the admission of threat

---

[5]     Maye points out that B.A. testified that Maye's car pinned Yussuf at the abdomen and legs, but that the medical examiner did not testify to injuries to either of those regions of Yussuf's body.

12

evidence is not a constitutional error, to obtain such relief, Maye has the burden to show that there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Holliday*, 745 N.W.2d 556, 568 (Minn. 2008) (citation omitted) (internal quotation marks omitted). In considering whether the error significantly affected the verdict, we consider several factors, including: "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020). Strong evidence of guilt can undermine the persuasive value of wrongfully admitted evidence. *See Matthews*, 800 N.W.2d at 634–35.

Applying these factors here, we conclude that no reasonable possibility exists that the evidence that B.A. received threatening phone calls before trial significantly affected the jury's verdict. To begin, while the manner in which the State presented the threat evidence was awkward and ineffective, it was isolated to a brief line of questioning at the end of B.A.'s direct examination—which otherwise spanned 42 transcript pages—in an effort to comply with the district court's restrictions on how the evidence could be elicited. Notably, the State did not bring up the evidence during re-direct examination or closing arguments. The State did not ask B.A. to repeat exactly what was said during these phone calls, and B.A. simply stated that whoever made the calls told him not to testify without using any graphic or inflammatory language. The threat evidence was vague and not highly probative of guilt. And Maye's counsel did fully and effectively cross examine B.A. on other inconsistencies in his version of events.

13

And while the State's evidence was not overwhelming, the generalized threat evidence in this case was overshadowed by strong evidence of guilt.[6] Evidence was presented that tensions rose between Yussuf and Maye throughout their time at the bar. The eyewitness to the crime, B.A., testified that Maye deliberately revved his engine and ran his vehicle into Yussuf. The medical examiner testified that the ultimate cause of Yussuf's death was uncontrolled swelling of his brain from the injury that he suffered when he was struck by the vehicle.

Testimony from police who interviewed B.A. after the incident showed that B.A.'s statement to police corroborated the contents of B.A.'s trial testimony. Crime scene photos taken that night show damage to the rear driver's side of Yussuf's car, near where B.A. testified Yussuf was standing when he was struck by Maye's vehicle. After Maye struck Yussuf with his car, Maye fled the scene and did not call 911.[7] Photos of Maye's car show damage to its front left corner, which supports B.A.'s account of the incident. And in a phone call with 911 days after the incident, Maye falsely told dispatch that he was not involved in Yussuf's death and knew nothing about what had occurred.[8]

---

[6] We note that Maye did not raise a challenge to the sufficiency of the State's evidence against him either before the court of appeals or our court.

[7] Evidence of flight after a crime suggests consciousness of guilt. *See State v. Bias*, 419 N.W.2d 480, 485 (Minn. 1988) ("The jury could and apparently did find the circumstances surrounding his abrupt departure to be incriminating.").

[8] Untruthfulness during the investigation of a crime can also indicate consciousness of guilt. *See State v. Andersen*, 784 N.W.2d 320, 330–32 (Minn. 2010) (citing the defendant's repeated false statements to police as evidence of guilt).

Having reviewed the record in light of the four factors set forth above, *see State v. Ferguson*, 581 N.W.2d 824, 833 (Minn. 1998), and considering the context of the entire trial and the limited nature of the threat evidence, Maye has failed to show a reasonable possibility that the erroneously admitted threat evidence significantly affected the verdict. The evidence was referred to only once briefly by a single witness, it was not addressed by the State in opening or closing arguments, and there was otherwise strong evidence of Maye's guilt. Given that the jury ultimately acquitted Maye of the more serious offense—second-degree intentional murder—we conclude it was unlikely that the threat evidence overwhelmed the jury's ability to evaluate the evidence fairly and rationally. *See State v. Washington*, 521 N.W.2d 35, 40 (Minn. 1994) (stating that "[w]here the jury has acquitted the appellant of some counts, but convicted the appellant of others, we view the verdicts as an 'indica[tion] that the members of the jury were not unduly' " influenced by the trial error (second alteration in original) (quoting *State v. DeWald*, 463 N.W.2d 741, 745 (Minn. 1990)). As a result, Maye is not entitled to reversal of his conviction and a new trial because the district court's erroneous admission of the threat evidence was harmless.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

ANDERSON, Justice (concurring in part, dissenting in part).

I join Part I of the majority opinion, holding that it was an abuse of discretion for the district court to admit evidence on direct examination that B.A. received at least two threatening phone calls from an unknown caller telling him not to testify. Because I would conclude that the record does not support the court's conclusion that there is no reasonable possibility that the erroneous admission of this evidence significantly affected the jury's verdict, I dissent as to Part II and would remand the case to the district court for a new trial.

I agree with the court that the threat evidence was a small part of the overall trial and was not featured heavily in the State's case. Indeed, we often conclude that an error is harmless because the evidence is not emphasized at trial or is only briefly mentioned. *See State v. Benton*, 858 N.W.2d 535, 542 (Minn. 2015); *State v. Fraga*, 898 N.W.2d 263, 274 (Minn. 2017); *State v. Williams*, 908 N.W.2d 362, 366 (Minn. 2018).

But this analytical approach does not work here. The court overstates the strength of the evidence against Maye and minimizes the impact the threat evidence could have reasonably had on the jury's view of the evidence.

The State's trial theory hinged on the jury finding the version of events offered by B.A. more credible than the competing version offered by Maye. There were no eyewitnesses to the crime other than B.A. and Maye, and the State presented little independent evidence corroborating the testimony of B.A., its most important witness. Not only is this a problem for the court's harmless error analysis, but the picture is further clouded because the two versions were mutually exclusive—the jury had to decide whether

to believe B.A. or Maye. It is reasonably possible (and perhaps even likely) that the improper admission of the threat evidence bolstered the credibility of B.A. and was a deciding factor for the jury's endorsement of the prosecution's preferred version of events—the version offered by B.A.

This conclusion is even more likely because the credibility of B.A. was in doubt, as his testimony directly contradicted the testimony of the medical examiner. B.A.'s recollection was that Maye's car pinned Yussuf against Yussuf's car at his abdomen and legs. But the medical examiner testified that Yussuf's "primary injuries [were] from the neck up" and that he had no injuries below his elbows. The medical examiner further testified that Yussuf did not have any internal damage to his organs, did not have any broken ribs, did not have any injuries whatsoever on his legs, and did not have any damage to his pelvis. B.A.'s testimony is plainly inconsistent with Yussuf's documented injuries, weakening his credibility. The erroneous admission of the threat evidence inappropriately bolstered his general credibility.

But the State argues in its principal brief that, if all else fails, the court of appeals should be affirmed because Maye sought no cautionary instruction. This is a paradigm red herring. Maye specifically moved the court for an order prohibiting the introduction of the threat evidence. The State admits that it was not alleging the threats came from Maye or at his direction. And it is undisputed that the district court instructed the State to make "clear to the jury, whether that's on direct examination or by stipulation that there's no allegation that Mr. Maye had anything to do with [the threats]."

There was no need for Maye to seek a cautionary instruction because it was error in the first instance for the district court to deny Maye's motion in limine and preemptively admit the threat evidence. We hold today that the district court abused its discretion by allowing *any* discussion about the threats made to B.A. We do so because there is inherent prejudice in admitting evidence that paints the defendant as a bad actor by implying that the defendant is guilty and by bolstering the general credibility of the witness—especially here when the entire case turned on whether the jury believed B.A. or Maye. Recognizing that prejudice is fundamental to our rules on the admission of threat evidence; our decisions—reaffirmed today—emphasize the steps that must be taken to safeguard against those risks. The district court failed to take those steps here.

More precisely, under our case law and present holding, a cautionary instruction only comes into play once the threat evidence is admitted in the first place. And we conclude that the district court should not have admitted the evidence in the first place. As the State concedes and the district court recognized, there is no link between the defendant and the threats.

Critically, B.A. never suggested (either at the time the motion in limine was decided or at trial) that he was frightened or reluctant to testify or that the threats caused him to alter his testimony. Under those circumstances, his willingness to show up and testify at trial made him no different than any other witness who does so. Because no evidence was presented that B.A. was, in any material way, affected by the threats, the threat evidence does nothing to actually rehabilitate his credibility.

Indeed, the State's only argument for admitting the threat evidence all along has been the possible need to bolster the general credibility of B.A.—a fundamental acknowledgment that the sole purpose of the evidence was to enhance the credibility of B.A. so that the jury would believe him instead of Maye.

What happened here should not have happened, and to place the burden on the defendant to fix this error by requesting a corrective instruction—as the State suggests—would place the burden on the wrong party. Had the district court offered to rectify the error by giving a corrective instruction, Maye might have been presented with a difficult choice—either to draw attention to the threat evidence with a corrective instruction, or to request that no such instruction be given.

Under the unique facts presented here, the burden to seek a corrective instruction did not lie with Maye.

For these reasons, I cannot say that the district court's error was harmless and thus, I would remand for a new trial.


HUDSON, Chief Justice (concurring in part, dissenting in part).

I join Part I of the majority opinion and join in the concurrence in part and dissent in part of Justice Anderson.


THISSEN, Justice (concurring in part, dissenting in part).

I join Part I of the majority opinion and join in the concurrence in part and dissent in part of Justice Anderson.