STATE of Minnesota, Respondent,

v.

Josue Robles FRAGA, Appellant.

A16-0726

Supreme Court of Minnesota.

Filed: June 28, 2017

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, Saint Paul, Minnesota; and Kathleen Kusz, Nobles County Attorney, Worthington, Minnesota; for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

## OPINION

GILDEA, Chief Justice.

Appellant Josue Robles Fraga appeals his conviction of first-degree murder in connection with the death of S.R., Fraga's 2-year-old niece. On direct appeal, Fraga alleges several evidentiary errors, prosecutorial misconduct, and errors in the sentencing order. Because we conclude that the district court either did not err or that any error was harmless and that the prosecutor did not commit misconduct, we affirm Fraga's first-degree murder conviction. But because the sentencing order erroneously convicts Fraga of all five murder counts, we remand to the district court to correct the order.

### FACTS

This case arises from the death of S.R., who, with her brother, lived with Fraga, his wife, and their four children in a mobile home in Worthington. The six children, including 2-year-old S.R., shared a bedroom. On the evening before S.R.'s death, Fraga was home with the six children while his wife was at work. Fraga picked his wife up from work around 2:30 a.m., and the two watched television for a short time before going to bed. At approximately 5 a.m., Fraga woke his wife, telling her that something was wrong with S.R. and that they needed to take her to the hospital. Fraga handed S.R. to his wife, who noticed that S.R. felt limp or "loose."

They arrived at the hospital at 5:35 a.m. and Fraga told the receptionist, "[S.R.] just stopped breathing." An EMT took S.R. and, observing that she was not breathing, rushed her into the emergency room while beginning efforts to resuscitate her. The EMT noted that S.R. was cold-to-the-touch, unresponsive, and had no heartbeat. S.R.'s body temperature was 84 degrees. The hospital staff saw bruises on

S.R.'s forehead, and the back of her head felt soft and "cushy," indicating swelling and a buildup of fluid. Her genitals were swollen and her stomach was discolored and distended. S.R. also had a rectal prolapse, meaning "that part of the rectum was sticking out" of her body.

While the hospital staff tried to resuscitate S.R., a doctor asked Fraga and his wife about the child's injuries. Fraga told the doctor that S.R.'s brother had jumped from a bunk bed onto S.R., landing on her with his knees. Because S.R.'s injuries—including a prolapsed rectum and trauma to her genitals—were not consistent with a small child jumping on her, hospital staff notified law enforcement about the unexplained trauma. The medical staff's attempts to resuscitate S.R. were unsuccessful and she was declared dead at 6:18 a.m. on March 20, 2008.

Based on S.R.'s low body temperature at the emergency room and the condition of her body, the medical examiner concluded that she died sometime between 9:30 p.m. on March 19 and 1:30 a.m. on March 20. The medical examiner noted multiple contusions on S.R.'s head and body, including her forehead, elbows, knees, and back. S.R. had traumatic head injuries, suggesting a number of substantial impacts to her head, which the examiner believed caused her death. S.R.'s hair was also "basically falling off her head" during the autopsy, which would not occur so soon after death unless she was losing hair while alive, likely because of malnutrition, extreme stress, or vitamin deficiency.

In addition, S.R. had an enlarged stomach because of a 2-inch tear in her stomach lining, which caused contents from her stomach to spill into her abdominal cavity. The likely cause of the rupture was substantial stomach compression resulting from external pressure to S.R.'s abdomen. S.R. also had abrasions on her mouth and lips and an injury to the inside of her mouth, suggesting to the medical examiner that somebody may have applied pressure to her mouth, likely to keep her quiet.

Finally, S.R. had extensive physical trauma to her sexual organs and a prolapsed rectum. S.R. had a hemorrhage more than 2 inches long inside her rectum. In the medical examiner's opinion, the rectal prolapse and injuries were caused by "some kind of forceful penetration to the rectal area." No semen deposits were found on S.R.'s body. But feces and semen were found on S.R.'s diaper. Police were able to exclude Fraga and one of his sons, Child A, as contributors to the semen but were otherwise unable to identify the source of the semen.

A detective interviewed Fraga about S.R.'s death. According to Fraga, on the night of S.R.'s death, the children were asleep by 10 p.m., after which he cleaned the kitchen and later picked up his wife from work. When he arrived home with his wife, he checked on the children and everything seemed fine. Fraga reported that he later woke and heard what he thought to be S.R. and her brother fighting. Fraga claimed that he saw S.R.'s brother jumping on her with his knees, so he picked up S.R., noticed that she felt "loose," and woke his wife. Fraga denied ever sexually or physically abusing S.R. Fraga also explained the stains on his pants, stating that he was wearing a dirty pair that he had worn the previous day when cleaning the bathroom. Later testing revealed that Fraga's clothing had feces and semen in several locations. When asked if he took any drugs, Fraga stated that he took medication for erectile dysfunction.

Police also spoke to one of Fraga's sons, Child A, and his daughter, Child B. Both denied knowing anything about S.R.'s death. Child A denied ever sexually touching S.R. or S.R.'s brother, and Child B

denied ever being sexually abused. Child B repeated that she had never been abused when interviewed the next day by a forensic interviewer.

Police collected Child A's clothing from the date and time of S.R.'s death, as well as a DNA sample from Child A. Testing revealed that Child A's clothing contained no fecal matter but had traces of his own semen. The detective who collected Child A's clothing gave Child A his business card and told him to call if he remembered anything.

That evening, Child A called the detective to report that he remembered seeing S.R.'s brother jump on S.R. the previous night. Police later learned that Child A had received a phone call shortly before he called police and that the call was from the motel where Fraga was staying. When asked about this call, Child A admitted that his father had called him and told him to tell the police that he had seen S.R.'s brother jumping on S.R.

As part of their investigation, police also searched Fraga's mobile home. In the bathroom, investigators found a roll of duct tape on the vanity. Fraga's wife later testified that the duct tape had not been there when she left for work earlier that day. There were also strips of used duct tape and tissues containing feces in the bathroom's wastebasket. The police discovered a wet pair of S.R.'s sweatpants containing a full bowel movement and Child A's semen in the bathtub.[1] Investigators also found a sock in Fraga's bedroom that had feces and Fraga's semen on it. They found bottles of male and female performance-enhancing dietary supplements, lubricant, and an adult video in Fraga's bedroom, as well as a condom in Fraga's car.

Following its investigation, the State charged Fraga with S.R.'s murder and a grand jury subsequently indicted Fraga on three counts of murder. After a jury trial, Fraga was convicted on all counts. At trial, Child A testified that he had never sexually touched S.R. and Child B testified that she did not witness S.R.'s murder. This testimony was consistent with the prior statements both children made to investigators.

But after trial, Child A admitted having sexual contact with S.R. and her brother. In light of that new evidence, the district court granted Fraga's request for a new trial.

Before the second trial and 3 years after S.R.'s death, Child B disclosed in a letter to a friend that she had also given false testimony at the first trial. Child B wrote that Fraga had in fact sexually abused her from the time she was in first or second grade, and that she had witnessed Fraga kill S.R. Child B asked her friend not to tell anyone, but the friend gave the letter to a therapist at the residential mental-health treatment center at which the two girls were living. The therapist contacted the police. After receiving this new evidence, a grand jury returned an amended indictment against Fraga, containing two additional counts of murder.[2]

---

1. At trial, Child A explained that, as an adolescent, he often had wet dreams and masturbated in the children's bedroom, grabbing the nearest clothing item in the room to clean himself, regardless of whether it belonged to him. A Bureau of Criminal Apprehension scientist stated at trial that it is not possible to tell how long sperm has been on clothing, and that semen can remain on clothing even after the clothing has been laundered.

2. The amended indictment charged Fraga with: (1) first-degree murder while committing criminal sexual conduct, Minn. Stat. § 609.185(a)(2) (2016); (2) first-degree murder while committing child abuse, Minn. Stat. § 609.185(a)(5) (2016); (3) first-degree murder while committing domestic abuse, Minn. Stat. § 609.185(a)(6) (2016); (4) second-degree murder while committing criminal sexual conduct, Minn. Stat. §§ 609.19, subd. 2(1);

At the second trial, the jury found Fraga guilty of all five counts. We reversed Fraga's convictions and remanded for a new trial. *State v. Fraga*, 864 N.W.2d 615 (Minn. 2015) (concluding that a juror who was actually biased against Fraga was seated).

This appeal follows from Fraga's third trial, which involved the same five counts of murder as the second trial. Child A and Child B testified at the third trial. During the trial, Child A acknowledged having initially lied about sexually touching S.R. and S.R.'s brother, but stated that he had never sexually penetrated either and denied having anything to do with S.R.'s death. Child A testified that he did not disclose the abuse earlier because he was afraid.

When Child B testified, she repeated the allegations from her letter. In particular, she stated that Fraga had repeatedly raped her, would give her pills, and used "some type of gel" when he sexually penetrated her. Child B also repeated that she had witnessed Fraga kill S.R. Specifically, Child B testified that sometime after the children had fallen asleep, Fraga went into their bedroom, woke Child B, and forced her to come into the master bedroom. Fraga attempted to remove her clothing, as he had done "many times" before, but for the first time she refused. Fraga got angry and grabbed S.R. out of bed. He brought the girls into the bathroom, and used duct tape to bind Child B to a chair to prevent her from getting up.

According to Child B, Fraga repeatedly thrust S.R.'s head into the toilet while flushing it. Then Fraga held S.R.'s head under the bathtub's faucet with her face pointing up as he turned on the water. Fraga repeated this several times, while also putting his hand over S.R.'s face to keep her from screaming. At one point, Fraga put so much pressure on S.R.'s stomach that feces and blood came out of her rectum. Child B remembers Fraga telling Child B "that's what happens when [you] refuse [me]."

Child B testified that Fraga eventually untaped her from the chair and let her return to the children's bedroom. He warned her that he would hurt her mother and brothers if she told anybody about the abuse. She returned to bed, but she could still hear S.R. struggling and screaming in the bathroom. Then all sounds from the bathroom ceased.

Fraga's wife and the other two Fraga children also testified. Fraga's wife stated that Fraga hit her about once a month. She also stated that within days of S.R.'s death, Fraga told her that Child A should take the blame for what happened to S.R. because he was a minor and would receive less severe punishment.

All four of Fraga's children testified that Fraga disciplined them by spanking them with a belt, which left marks and made it painful to sit down. A foster parent testified that S.R.'s brother told her that Fraga had "poked something in his butt." And another of Fraga's sons, Child C, stated that Fraga once choked him.

The State also offered testimony from medical experts. These experts explained that over the period during which S.R. and her brother lived with Fraga, the two children lost weight at an age when they should have been gaining weight.

S.R.'s father, Fraga's brother, also testified as part of the State's case. S.R.'s father explained why S.R. and her brother were living with Fraga. He noted that S.R. was a social security recipient and that

609.342, subd. 1(a) (2016); and (5) second-degree murder while committing assault in the first degree, Minn. Stat. §§ 609.19, subd. 2(1); 609.221, subd. 1 (2016).

Fraga received the income as the payee. He also stated that Fraga sold adult videos. In addition, Fraga's brother testified that Fraga sexually assaulted him approximately two times when he was 10 or 11 years old by forcible anal penetration. Fraga's brother stated that he first informed social workers of this abuse in the fall of 2007 because he was trying to regain custody of his children.

Finally, Fraga testified on his own behalf. He denied ever sexually or physically abusing his brother, his wife, or his children. Fraga also denied killing S.R. He repeated the statement that he had given investigators that he found S.R.'s brother jumping on her when he woke up around 5 a.m. Fraga acknowledged that this conduct could not have caused all of S.R.'s injuries, but he denied knowing what or who had caused the injuries. Fraga also denied telling Child A to tell the police that S.R.'s brother had jumped on S.R.

The jury found Fraga guilty of five counts of murder, and the district court sentenced Fraga on the first count: first-degree murder while committing criminal sexual conduct. The district court imposed the mandatory sentence of life in prison without the possibility of release. In its sentencing order, the district court entered convictions on all five counts of murder. This direct appeal follows.

## ANALYSIS

On direct appeal, Fraga contends that the district court committed reversible error in its evidentiary rulings. Specifically, Fraga challenges the district court's refusal to admit audio and video recordings of the investigators' interviews with Child B. Fraga also challenges the court's decisions to admit evidence to establish the following facts: Fraga sexually abused his brother; Fraga took medication for erectile dysfunction; Fraga's home contained sex-related items; Fraga received financial assistance to care for S.R. and her brother, but S.R. and her brother were nevertheless in poor health; and Fraga sold adult videos and he possessed one such video. In addition to the alleged evidentiary errors, Fraga contends that the prosecutor committed misconduct that requires a new trial and that the sentencing order is erroneous. We consider each argument in turn.

### I.

We turn first to Fraga's contention that the district court erred in denying the admission of over 2 hours of audio and video recordings of three interviews with Child B. In these interviews, which occurred shortly after S.R.'s death, Child B denied that Fraga abused her and disclaimed any knowledge about S.R.'s murder. According to the defense, the recordings were the best evidence to show that Child B did not appear afraid or upset during the interviews, and the recordings would therefore rebut her testimony at trial that she had lied because she was afraid. The State objected, arguing that playing the recordings in their entirety would be cumulative and a waste of time. The State observed that Child B had repeatedly admitted making the inconsistent statements, rendering the recordings cumulative. The State instead suggested that the court play only the portions of the recorded interviews that involved Child B's prior inconsistent statements.

After reviewing the recordings, the district court denied Fraga's request to play the entire 2.3 hours of audio and video interviews. In explaining its ruling, the court observed that Child B had admitted the prior inconsistent statements, and it concluded that the probative value of the recorded interviews was outweighed by the considerations of Minn. R. Evid. 403 (noting that evidence may be excluded

where its probative value is substantially outweighed by its potential to confuse the issues, mislead the jury, cause undue delay or waste of time, or needlessly present cumulative evidence).

■ Fraga argues that the district court's decision violated his constitutional right to a meaningful opportunity to present a complete defense. And he contends that the recordings were necessary to allow him to adequately challenge the credibility of Child B, who was an important witness for the State. We have recognized that due process requires that every defendant be "afforded a meaningful opportunity to present a complete defense." *See State v. Smith*, 876 N.W.2d 310, 331 (Minn. 2016) (citations omitted) (internal quotation marks omitted). But, as we have noted, "the evidence proffered in support of the defense must still comply with the rules of evidence." *State v. Nissalke*, 801 N.W.2d 82, 102 (Minn. 2011); *see also State v. Jenkins*, 782 N.W.2d 211, 224 (Minn. 2010) ("[C]ourts may limit the defendant's evidence to ensure that the defendant does not confuse or mislead the jury.").

The district court grounded its decision to exclude the recordings in Minn. R. Evid. 403. The court conducted the proper analysis under Rule 403 and our review of the record confirms that the court's ruling was not an abuse of discretion. *See State v. Moua*, 678 N.W.2d 29, 37 (Minn. 2004) (stating that we will not reverse a district court's evidentiary ruling absent a clear abuse of discretion). Fraga sought to introduce into evidence the entirety of three recordings that totaled 2.3 hours, most of which were not inconsistent with Child B's trial testimony. The defense never offered to introduce only portions of the recordings. Moreover, Child B was repeatedly

questioned by both parties during trial about her inconsistent statements. Indeed, the State and the defense asked Child B over 120 questions about these prior inconsistent statements. And the defense thoroughly cross-examined Child B on her prior inconsistent statements, spending the majority of its cross-examination asking approximately 85 questions about them. Under these circumstances, we cannot say that the district court abused its discretion in declining to admit the entirety of the three recordings.

■ In urging us to reach the opposite conclusion, Fraga relies on Minnesota Rule of Evidence 613(b). This rule permits the admission of extrinsic evidence of a witness's prior inconsistent statement, as long as the witness is "afforded a prior opportunity to explain or deny the same" and the opposite party is given an opportunity to cross-examine the witness on the statement. *Id.* Because both of the requirements of the rule were satisfied here, Fraga argues that Rule 613(b) required the admission of the recordings. We are not persuaded. The comments to the rule state that its procedure "obviate[s] the necessity for proof by extrinsic evidence if the witness admits making the inconsistent statement."[3] Minn. R. Evid. 613(b) comm. cmt.—1977. In this case, because Child B repeatedly admitted making the inconsistent statements, the district court's decision to exclude the extrinsic evidence—the recordings—is consistent with Rule 613(b).

Fraga also argues that under our decision in *State v. Pearson*, 775 N.W.2d 155 (Minn. 2009), the recordings should have been admitted to allow the jury to evaluate Child B's credibility even if she had already acknowledged making the prior in-

---

3. Although we are not bound by rule commentary, we have previously recognized that committee comments can provide useful guid-

ance. *See State v. Dahlin*, 753 N.W.2d 300, 307 (Minn. 2008).

consistent statements. This argument is also unavailing. In *Pearson*, we held that it was *not* an abuse of discretion for the district court *to admit* one video recording of a prior inconsistent statement made by the defendant to a police officer even when the defendant had already acknowledged making inconsistent statements. *Id.* at 159-60. Despite Fraga's assertion to the contrary, our analysis in *Pearson* does not compel the converse holding: that it *is* an abuse of discretion for the district court *to exclude* such recordings. Nothing in *Pearson* suggests that a court must admit a witness's entire prior recorded statement when the admission of the recording would be cumulative or a waste of time. Moreover, *Pearson* is distinguishable because the evidence in that case was directly relevant to a substantive issue: it was used as rebuttal evidence to counter the defendant's claim of self-defense. *Id.* at 160. The videos in this case were offered only as impeachment evidence. For all of these reasons, Fraga's reliance on *Pearson* is misplaced.

■ Finally, Fraga argues that the district court's decision was an abuse of discretion because the State "opened the door" to the admission of at least one of the recordings. Specifically, Fraga requested that the court reconsider admitting one of the recordings involving Child B after the State called Colleen, a forensic interviewer who spoke with Child B during the investigation, as a witness at trial. Colleen testified about her interview with Child B, noting that during the interview, Child B was "guarded ... sort of cautious or careful about how she answered questions or what she said." According to Colleen, children are typically guarded if they are worried or afraid of something, or if they are shy, or if they do not want to talk about difficult things. On cross-examination, Colleen clarified that her assessment

was based on Child B's caution in choosing her words, and not based on mannerisms or Child B's inflection, which Colleen noted could also have indicated that Child B was anxious or sad. After Colleen's testimony, Fraga asked the district court to reconsider its ruling on the recorded interview Colleen had conducted with Child B, but the court declined.

■ On appeal, Fraga argues that the State's witness opened the door to the admission of Colleen's recorded interview with Child B. A party "opens the door" when it introduces evidence that creates a right in the opposing party to respond with evidence that would otherwise be inadmissible. *State v. Valtierra*, 718 N.W.2d 425, 436 (Minn. 2006). The right to respond helps to ensure that one party will not have an unfair advantage and that the factfinder is not presented with a "misleading or distorted representation of reality." *Id.* (citation omitted) (internal quotation marks omitted). But the opening-the-door doctrine "must be applied cautiously" and its application is left to the discretion of the district court. *Id.*

In urging us to reverse the district court's decision to exclude the recording of Colleen's interview with Child B, Fraga contends that the jury had a "misleading or distorted representation" of the interview by hearing only from Colleen without seeing the recording of the interview. Fraga relies on Colleen's explanation that, based on Child B's demeanor during the interview, Colleen was concerned that Child B may have been abused even though she denied it. Fraga argues that the jury needed to see the recording to observe Child B's demeanor, which in turn would allow the jury to evaluate Child B's credibility.

But Fraga fails to identify which aspects of Colleen's description of the interview with Child B were inaccurate or mislead-

ing. *See id.* at 436 (noting that the opening-the-door doctrine permits admission of evidence when necessary to correct a "misleading or distorted representation of reality"). Further, Colleen's testimony that Child B seemed "guarded" does not necessarily affect her credibility, as Fraga argues. As Colleen explained, Child B may have been guarded because she was shy, worried, or unwilling to discuss a difficult topic; such reluctance would not be surprising given that the interview occurred one day after S.R.'s death. Finally, Child B's credibility was vigorously challenged during cross-examination. Under the circumstances here, we cannot conclude that Fraga met his burden to show that the district court abused its discretion. *See State v. Pendleton*, 706 N.W.2d 500, 510 (Minn. 2005) (stating that the appellant has the burden to prove that the district court abused its discretion).

## II.

We turn next to Fraga's arguments that the district court committed reversible error in admitting the following: (1) evidence that Fraga sexually abused his brother; (2) evidence that Fraga took medication for erectile dysfunction and that his home and vehicle contained sex-related items; (3) evidence that Fraga received financial assistance to care for S.R. and her brother along with evidence that both appeared to be in poor health; and (4) evidence that

Fraga sold adult videos and possessed one such video. We address each category in turn.

### A.

■ Fraga first challenges the district court's admission of evidence that Fraga sexually abused his brother, who at the time of the alleged abuse was 10 or 11 years old. Fraga denies these allegations and contends that this evidence is irrelevant and highly prejudicial under Minn. R. Evid. 403. The State argues that the evidence was admissible as evidence of a past pattern of domestic abuse, Minn. Stat. § 609.185(a)(6) (2016), and relationship evidence under Minn. Stat. § 634.20 (2016). The evidence was likely not admissible as evidence of a past pattern because of the length of time between the alleged abuse of Fraga's brother and the abuse of Fraga's wife and children. *See State v. Clark*, 739 N.W.2d 412, 421 (Minn. 2007) (concluding that two incidents of domestic abuse against a victim that occurred 13-15 years prior to later instances of abuse were too distant in time to establish a past pattern). And even if the evidence was also inadmissible under section 634.20, an issue we do not decide, Fraga is not entitled to a new trial on the basis of this error unless he demonstrates a reasonable possibility that the alleged error substantially affected the verdict.[4] *See State v. Moore*, 846 N.W.2d

4. Fraga contends that the erroneous admission of his prior bad acts must be evaluated under the constitutional harmless-error test because·in *State v. Fardan*, we said our "general exclusionary rule is grounded in the defendant's constitutional right to a fair trial." 773 N.W.2d 303, 315 (Minn. 2009) (citations omitted) (internal quotation marks omitted). Under the constitutional harmless-error test, an error is harmless only if the verdict was surely unattributable to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997). Neither *Fardan* nor *Townsend v. State*, 646 N.W.2d 218, 223 (Minn. 2002), however, re-

quire us to apply the constitutional harmless-error test to the erroneous admission of prior bad acts evidence. In *Fardan*, we said that the surely-unattributable test does not apply to the erroneous admission of prior bad act evidence. 773 N.W.2d at 320 n.9 (stating that *Townsend* held only that, even if we applied the stricter constitutional harmless-error test, the error was harmless). Instead, applying the non-constitutional harmless-error test, we concluded in *Fardan* that there was no reasonable possibility that the erroneous admission of the defendant's prior criminal sexual

83, 92 (Minn. 2014) (explaining that we did not need to decide whether testimony by the defendant's former wife was improperly admitted because the defendant failed to establish that the alleged error significantly affected the verdict).

In determining whether a defendant has established a reasonable likelihood that the erroneous admission of prior bad acts evidence substantially affected the verdict, we consider whether the district court provided the jury a cautionary instruction, whether the State dwelled on the evidence in closing argument, and whether the evidence of guilt was strong. *State v. Thao*, 875 N.W.2d 834, 839 (Minn. 2016); *State v. Hill*, 801 N.W.2d 646, 658-59 (Minn. 2011). The district court provided a cautionary instruction that informed the jury that they should not convict Fraga based on his behavior toward his brother. The State did not dwell on the other bad acts evidence either, mentioning it only once during closing argument. And the State's case against Fraga was strong. Child B gave a first-hand account of the abuse and murder of S.R. and physical evidence found in the mobile home (such as used duct tape and tissues with feces) and the severe injuries found during S.R.'s autopsy corroborated Child B's testimony. Fraga was also the only adult in the small mobile home at the time of S.R.'s death, and Fraga asked Child A to tell the police that he had seen S.R.'s brother jumping on S.R.

Based on the entire record, we conclude that there is no reasonable possibility that the admission of Fraga's alleged prior sexual abuse of his brother substantially affected the jury's verdict. The allegedly erroneous admission of the evidence therefore was harmless.

### B.

Fraga next argues that the district court erred in admitting irrelevant and unfairly

prejudicial evidence that Fraga took medication for erectile dysfunction and that the following items were found in Fraga's home and car: a dietary supplement for women labeled "Steel Libido," sexual lubricant, and a condom. The district court admitted this evidence over Fraga's pretrial objections.

With respect to the erectile-dysfunction evidence, Fraga told investigators that he took medication for erectile dysfunction during an initial interview. The State offered evidence that Fraga took this medication as a way to counter his suggestion that he could not have sexually assaulted Child B or S.R. because he had erectile dysfunction. The district court admitted the evidence, concluding that it was more probative than prejudicial. On the prejudicial impact, the court noted that advertisements for erectile dysfunction medications are common on television, so the evidence would not have improperly inflamed the jury's passions against Fraga. *See State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006) (stating that unfair prejudice means evidence that persuades the jury "by illegitimate means, giving one party an unfair advantage" (citation omitted) (internal quotation marks omitted)).

Given our deferential standard of review, we cannot conclude that the court erred in its analysis. By stating that he had problems with sexual performance, Fraga suggested a defense to the sexual abuse of Child B and the penetration of S.R. The district court did not abuse its discretion in concluding that admitting evidence of the medication, to address the potential defense, was relevant. *See* Minn. R. Evid. 401 (noting that "relevant evidence" is evidence with "*any* tendency to

conduct significantly affected the jury's ver-

dict. *Id.* at 320-21.

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" (emphasis added)); *see also State v. Schulz*, 691 N.W.2d 474, 478 (Minn. 2005) (stating that evidence is relevant when it "warrants a jury in drawing a logical inference assisting, even though remotely, the determination of the issue in question"). And the district court's weighing of the probative value versus the potential prejudice comports with Minn. R. Evid. 403. Accordingly, we hold that the district court did not commit reversible error in admitting this evidence.

■ The district court's decision to admit other sex-related evidence likewise was not an abuse of discretion. The "Steel Libido" women's dietary supplement and the lubricant were relevant and probative because this evidence corroborated Child B's testimony. At trial, Child B testified that Fraga gave her pills that looked like the "Steel Libido" supplements investigators found in the home and used "some type of gel" when he sexually penetrated her. Evidence of the condom found in Fraga's car was relevant because it was a potential explanation for the lack of Fraga's semen in and around S.R. And the introduction of evidence of a single condom found in an adult's car is itself not "particularly inflammatory" such that it would persuade the jury by illegitimate means. *Bell*, 719 N.W.2d at 641.

### C.

■ Fraga also argues that the district court erred by admitting evidence that

Fraga received financial assistance to care for S.R. and her brother along with evidence that both appeared to be in poor health.[5] It is undisputed that Fraga received income as the "representative payee" for S.R.'s social security income, and income for assuming custody of S.R. and her brother. A former Nobles County social worker testified that Fraga received a total of $11,915 in assistance from July 2007 to March 2008. The social worker testified that the agency did not follow up to see how the money was spent. At a pretrial hearing, Fraga sought to exclude evidence that he received these financial benefits on the ground that the jurors would view his receipt of benefits as imposing a burden on taxpayers.

The State also introduced evidence that both S.R. and her brother were in poor health after living with Fraga. S.R. weighed 20 pounds, 10 ounces in June 2007 before she and her brother moved in with Fraga, and weighed 2 ounces less at the time of her death in March 2008. At the time of her death, S.R.'s hair was also falling out in clumps, which the medical examiner noted is a symptom of malnutrition, extreme stress, or vitamin deficiency. A social worker also testified that S.R.'s brother was very thin in March 2008, had sunken-in cheeks and a grayish color. She stated that within 2 weeks of being in foster care, he gained 5 pounds and his skin returned to a normal color.

On appeal, Fraga challenges the admission of both types of evidence but his challenges are unpersuasive. Evidence that Fraga had the resources to feed S.R. and her brother along with evidence that both were in poor health was relevant to count

---

5. Because Fraga objected to the evidence of financial benefits but not to the evidence of the children's health, the alleged errors trigger two different tests on review. *See State v. Matthews*, 779 N.W.2d 543, 548, 553 (Minn. 2010) (stating that we review an unobjected-

to error for plain error, but review an error to which an objection was made under an abuse-of-discretion standard). But because we conclude that the district court did not err in admitting any of this evidence, we reach the same result under either test.

two, causing the death of a minor "while committing child abuse," Minn. Stat. § 609.185(a)(5) (2016).[6] The State could have drawn on this evidence to show that Fraga engaged in a pattern of child abuse by neglecting the children or, at a minimum, by being indifferent to their continued survival. Because this evidence was relevant to prove an element of one of the charged offenses, Fraga is incorrect that the evidence was used as inadmissible character evidence under Minn. R. Evid. 404(b).[7]

In addition, the admission of this evidence could not have unduly prejudiced Fraga because it did not "persuade[ ] by illegitimate means." *Bell*, 719 N.W.2d at 641. As the district court noted, it is "common knowledge" that there is financial support for children that are placed in a non-parental home. Similarly, the health evidence was not unduly prejudicial. This

evidence was admitted through the testimony of trained, neutral third parties and it was directly relevant to an element of the charged offenses. *Cf. State v. Dame*, 670 N.W.2d 261, 265 (Minn. 2003) (stating that crime-scene and autopsy photographs were probative for determining the elements of first-degree murder). The district court therefore did not abuse its discretion in admitting evidence that Fraga received financial assistance to care for S.R. and her brother, along with evidence that the two children appeared to be in poor health.

### D.

■■■■ Fraga next contends that the district court erred when it admitted evidence that Fraga sold adult videos and possessed one such video. Because Fraga did not object to the admission of this evidence at trial, he forfeited review of his claims.[8] *See State v. Beaulieu*, 859 N.W.2d

---

6. Count two of the amended indictment required the State to prove that Fraga caused the death of a minor "while committing child abuse" and that he engaged in a "past pattern of child abuse upon a child." Minn. Stat. § 609.185(a)(5). "Child abuse," as used in that section, includes neglect or endangerment of a child. *See* Minn. Stat. § 609.185(d) (2016) (defining "child abuse" as including a violation of Minn. Stat. § 609.378 (2016)). A legal guardian or caretaker is guilty of neglect or endangerment of a child when that individual "willfully deprives a child of necessary food, clothing, [or] shelter … when the … caretaker is reasonably able to make the necessary provisions and the deprivation harms … the child's physical, mental, or emotional health." Minn. Stat. § 609.378.

7. On appeal, the State contends that the evidence suggesting that Fraga failed to provide adequate nutrition to S.R. and her brother when he had the resources to do it was relevant to prove that Fraga caused S.R.'s death "under circumstances manifesting extreme indifference to human life" under counts two and three. Minn. Stat. § 609.185(a)(5)-(6). But the State's theory at trial was not that S.R. died from malnutrition under the extreme indifference element, but rather that

S.R. had been beaten. *See Lussier v. State*, 821 N.W.2d 581, 590 (Minn. 2012) (stating that under the first-degree murder statute the actions that *cause* the victim's death must show an extreme indifference to human life).

8. This issue was raised at a pre-trial hearing. The defense sought to exclude testimony about the adult videos, but the State argued that the evidence was relevant to explain a discrepancy in Child B's testimony. Specifically, the State explained that Child B might testify that Fraga kept a box of adult videos, but the police found only one video during its search of the home. The district court denied the pre-trial motion to exclude the evidence, ruling that the State could use the evidence "to address the concern raised by the State that it confirms the testimony of [Child B] that there had been more." At trial, the State introduced evidence of the adult video it found. The next day, Child B testified. The State did not ask Child B about the adult videos and the defense did not cross-examine her on them. The following week at trial, Fraga's brother testified without objection that Fraga sold adult videos. Fraga now argues that the evidence became irrelevant and inadmissible when Child B did not testify about the adult videos.

275, 278 (Minn. 2015) ("[A] right of any ... sort[] may be forfeited in criminal ... cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (citation omitted) (internal quotation marks omitted)). But the plain-error rule provides a "limited power" to correct certain errors that a defendant has forfeited. *Id.* at 279. (citation omitted) (internal quotation marks omitted).

■■■■ The plain-error rule requires a defendant to establish (1) an error, (2) that is plain in that it violates or contradicts case law or a rule, and (3) that the error affects the defendant's substantial rights. *State v. Matthews*, 779 N.W.2d 543, 548-49 (Minn. 2010). If all three requirements are met, we then determine whether relief is required to "ensure fairness and the integrity of the judicial proceedings." *Id.* at 549 (quoting *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998)) (internal quotation marks omitted). An error affects substantial rights if there is a reasonable likelihood that it substantially affected the verdict. *State v. Rossberg*, 851 N.W.2d 609, 618 (Minn. 2014) (citation omitted) (internal quotation marks omitted).

Fraga argues that the district court erred when it admitted evidence that he sold adult videos and possessed one such video because the evidence was irrelevant and highly prejudicial. We need not decide whether the district court erred when it admitted the evidence because Fraga has failed to establish that the alleged error affected his substantial rights. *See State v. Robertson*, 884 N.W.2d 864, 876 (Minn. 2016) ("We need not and do not consider the first two steps of the plain error analysis because Robertson has not shown that the alleged error affected his substantial rights.").

■■■■ The defendant bears the "heavy burden" of persuasion on whether the evidence affected the defendant's substantial rights. *See Rossberg*, 851 N.W.2d at 618; *State v. Sontoya*, 788 N.W.2d 868, 873 (Minn. 2010). When considering whether an error affected a defendant's substantial rights within the context of the plain-error rule, we consider "the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *State v. Mosley*, 853 N.W.2d 789, 803 (Minn. 2014) (citations omitted) (internal quotation marks omitted).

Here, the evidence against Fraga was strong. Moreover, evidence that Fraga sold adult videos and that one such a video was found in his home made up only a few sentences in the transcript from a 12-day trial. The prosecutor did not mention the adult videos in his closing arguments. Fraga had the opportunity to, but did not, object to or rebut the testimony that he sold adult videos or that one such video was found in his home. Based on this record, there is not a reasonable likelihood that the alleged errors substantially affected the verdict.

### III.

■■■■ We turn next to Fraga's argument that the prosecutor committed plain error

---

The district court's ruling in effect conditionally overruled Fraga's pre-trial objection, which was based on allowing the State to corroborate Child B's testimony. *See Haynes v. Washington*, 373 U.S. 503, 507, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (recognizing that a district court may admit evidence as "conditionally" admissible). The court's ruling was appropriate given the anticipated testimony. But then Fraga failed to object when Child B did not testify about the videos. We therefore review Fraga's claim under the plain-error rule.

during closing argument. The prosecutor referred to the evidence that Fraga received financial benefits to care for S.R. and her brother along with evidence that both were in poor health in his closing argument. He stated that S.R. lost weight when she should have been gaining weight "notwithstanding, you know, thousands of dollars of money that are coming into the family, some of which should certainly be used to help [S.R.]." Finally, he repeated that Fraga received $11,915 in assistance "without any oversight." Fraga did not object to any of these statements. On appeal, Fraga claims that these statements were improper because they insinuated that he intentionally deprived the children of food and care.

Because Fraga did not object to the prosecutor's statements at trial, we review Fraga's challenge under a modified plain-error test. Under this test, Fraga has the burden to demonstrate that the prosecutor's misconduct was (1) an error, and (2) that error was plain. *Matthews*, 779 N.W.2d at 551. If Fraga establishes both elements, the burden then shifts to the State to demonstrate that the error did not affect Fraga's substantial rights. *Id.* Fraga has not met his burden to show error here.

In closing argument, a prosecutor must "avoid inflaming the jury's passions and prejudices against the defendant." *State v. Porter*, 526 N.W.2d 359, 363 (Minn. 1995). But a prosecutor may make "all legitimate arguments on the evidence" and may draw reasonable inferences from the evidence. *Nunn v. State*, 753 N.W.2d 657, 663 (Minn. 2008). The jury then determines the "convincing power" of those inferences. *Schulz*, 691 N.W.2d at 478.

As we have already concluded, evidence that Fraga had the resources to care for S.R. and her brother and that both were in poor health was properly admitted to establish the "past pattern of child abuse"

element of count two. *See* Minn. Stat. § 609.185(a)(5). The prosecutor's statements during closing argument either repeated testimony that was properly admitted at trial or drew reasonable inferences from those facts. The prosecutor's arguments therefore did not constitute an error, much less a plain error.

## IV.

Fraga next argues that the cumulative effect of trial errors denied him a fair trial. An appellant may be entitled to a new trial in rare cases where the "errors, when taken cumulatively, have the effect of denying [the] appellant a fair trial." *State v. Yang*, 774 N.W.2d 539, 560 (Minn. 2009). When considering a claim of cumulative error, we look to the egregiousness of the errors and the strength of the State's case. *See State v. Cermak*, 350 N.W.2d 328, 333-34 (Minn. 1984) (stating that reversals based on cumulative error typically involve serious errors with weak evidence of guilt).

In this case, we have concluded that two alleged errors—admitted evidence of Fraga's prior sexual abuse of his brother and of Fraga's possession and sale of adult videos—did not affect the verdict when viewed separately. Viewing the alleged errors together, we reach the same conclusion. The testimony of Fraga's brother, to which the State only briefly referred during closing argument, was accompanied by a limiting instruction. The testimony that Fraga sold adult videos along with evidence that such a video was found in his home was only briefly mentioned over a lengthy 12-day trial. The prosecutor also did not mention the adult videos in his closing arguments. These errors, when taken together, were not "enough to tip the scales" toward producing an unfair trial. *See Hill*, 801 N.W.2d at 659 (citations

omitted) (internal quotation marks omitted).

Moreover, we are more inclined to order a new trial for cumulative errors in very close factual cases. *See State v. Davis*, 820 N.W.2d 525, 539 (Minn. 2012); *State v. Underwood*, 281 N.W.2d 337, 340 (Minn. 1979) (reversing based on cumulative error where there was substantial conflicting testimony and difficult factual determinations). This is not such a case. As we have explained above, the evidence of Fraga's guilt was strong. Based on this record, it cannot be said that the alleged errors, when considered cumulatively, had the effect of denying Fraga a fair trial.

### V.

Finally, the parties agree that the district court's sentencing order erroneously states that Fraga was convicted of all five murder charges. *See State v. Pippitt*, 645 N.W.2d 87, 96 (Minn. 2002) (holding that the defendant could not be convicted of two counts of murder for the same act against the same victim). We therefore remand to the district court for correction of the sentencing order.[9]

### CONCLUSION

For the foregoing reasons, we affirm Fraga's conviction of first-degree murder while committing criminal sexual conduct and remand for correction of the sentencing order.

Affirmed and remanded.

---

9. After sentencing Fraga to life in prison without the possibility of release, the district court stated that it was imposing the sentence "with the understanding that, notwithstanding any provision of law in the future, the Defendant shall remain in custody through the entire term." A district court, however, does not have the power to insulate a sentence from future changes in law that might apply under retroactivity principles. *See State v. Osterloh*, 275 N.W.2d 578, 580-81 (Minn. 1978) (stating that the court has "only the statutory sentencing authority proscribed by the legislature"). Consequently, the district court's statement of intent is of no legal effect.