HUDSON, Justice.
Appellant Jamaine Jamie Williams was found guilty by a jury of two counts of first-degree murder, two counts of second-degree murder, and one count of attempted second-degree murder after a home-invasion shooting in an apartment left two men dead and a third gravely wounded. Williams is now serving two consecutive life sentences and a consecutive term of 153 months in prison. On direct appeal, Williams argues the district court committed reversible error by (1) allowing the State to depose a material witness before trial; (2) admitting a redacted transcript of the deposition at trial; and (3) admitting evidence that, 1 week before the murders, in that same apartment, Williams had pointed a gun at two of the victims and threatened to "kill everybody" in the apartment. According to Williams, the alleged errors were harmful because the formal nature of the deposition unfairly bolstered the deposed witness's credibility and the evidence regarding his prior threat unfairly influenced the jury.[1] Williams also argues that if any of the alleged errors, standing alone, is insufficient to justify a new trial, the cumulative effect of the alleged errors deprived him of a fair trial. We conclude that the alleged errors, whether separate or cumulative, were harmless because there is no reasonable possibility that they substantially affected the verdict. We therefore affirm Williams's convictions.
FACTS
At approximately 12:30 a.m. on December 10, 2015, a shooting took place at the Saint Paul apartment of J.S. At the time of the shooting, there were several people in *364 the apartment, including J.S.; J.S.'s housemate S.L., who had previously been in a relationship with Williams and had two children with him; D.J., who was in a relationship with S.L.; K.P., a friend of D.J.'s, who was in a relationship with J.S.; and P.T., a friend of D.J.'s. Police arrived at the apartment soon after receiving multiple reports of shots fired. They found D.J. and K.P. inside the apartment, dead from multiple gunshot wounds. A trail of blood led from the apartment to P.T., who was found approximately one block away with multiple gunshot wounds, including to the head. P.T. was taken to the hospital and survived after intensive medical treatment.
In the hours preceding the shooting, appellant Jamaine Jamie Williams sent a series of threatening text messages to S.L. Williams also asked S.L. if he could come over to the apartment, but she avoided answering his question. Cell phone records indicated Williams's cell phone was in an area that included the apartment at 12:31 a.m.
Williams had previously lived at the apartment with S.L., J.S., and the children, but he had moved out after he and S.L. ended their relationship. Williams was upset after the break-up and suspected that S.L. was dating either D.J. or K.P. Shortly after midnight, there was a knock on the door to the apartment. J.S. opened the door and saw Williams there. He pointed a gun at her, told her to move, and entered the apartment. S.L. and J.S. fled the apartment and ran to nearby United Hospital.
A security guard at United Hospital testified to seeing the two women run hysterically to the hospital early on December 10. J.S.'s mother testified at trial that J.S. called her at approximately 1:00 a.m. and said that Williams "had just shot her house up." The security guard testified that she overheard J.S. tell her mother that "JJ" (J.S.'s nickname for Williams) shot up J.S.'s house.
Later that day, police recovered a black jacket from underneath a car several blocks from the apartment. The jacket had gunshot residue on the front and sleeves, as well as DNA on the collar and cuffs. The DNA on one of the cuffs contained a mixture from three or more individuals. Later analysis of the DNA indicated Williams was the most probable match for the major DNA profile developed from the DNA found on the cuff.
Around noon on the day of the shooting, the police took Williams into custody at a residence in Bloomington. Williams was heard on the squad car video saying into his cell phone that "they got me bro." A car at the residence contained dried blood on the driver's seat and a 9-millimeter shell casing under the front passenger seat. The shell matched casings found at the murder scene.
The next day, the State charged Williams with the shooting. A Ramsey County grand jury later indicted Williams on two counts of first-degree murder, two counts of second-degree murder, one count of attempted first-degree murder, and one count of attempted second-degree murder.
The district court ordered S.L., as a material witness, to appear for the trial and to contact the State's victim-and-witness advocate on specified dates before the trial. Approximately 1 month later, after S.L. failed to contact the advocate, the district court issued a bench warrant for S.L.'s arrest. S.L. contacted the advocate 2 days later. The district court issued another order requiring S.L. to appear on the trial date and to contact the advocate weekly.
Approximately 1 week after the district court's second order, the defense moved to *365 continue the trial date. The State opposed the motion, arguing that a delay might jeopardize S.L.'s availability as a witness. The district court granted the motion.
After the continuance was granted, delaying the trial by several weeks, the State moved to depose S.L. as a material witness, pursuant to Rules 21.01(a) and 21.06, subdivision 1(b), of the Minnesota Rules of Criminal Procedure.[2] The State argued that S.L. had demonstrated she was unwilling to participate in the State's case, raising concerns that she might refuse to appear and testify as ordered. Williams objected to the State's request and argued that S.L. did not qualify as an unavailable witness. The district court granted the State's motion, and the State deposed S.L.
S.L. testified at trial, but her testimony conflicted with statements she made during the deposition and with her previous statements to police, as well as with J.S.'s testimony at trial. S.L. asserted at trial that she had previously identified Williams as the shooter only because she had been threatened by the police. In addition to S.L.'s testimony at trial, a redacted transcript[3] of her deposition was introduced as an exhibit and admitted for both substantive and impeachment purposes.
The district court also admitted evidence, over defense objection, about an incident that occurred at the apartment on December 2, 2015, 1 week before the shootings. On that occasion, Williams was at the apartment with S.L. when D.J. and K.P. arrived with J.S. Williams had a gun and said that he would kill everyone in the apartment. D.J. and K.P. decided to leave the apartment. As the two men were leaving, Williams pointed the gun at them.
The jury found Williams guilty of two counts of first-degree murder, two counts of second-degree murder, and one count of attempted second-degree murder. After his sentencing, Williams appealed, arguing that the district court erred in allowing the State to depose S.L. and in admitting evidence related to the incident that occurred on December 2. Williams contends that he is entitled to a new trial because of the alleged evidentiary errors by the district court. We disagree.
ANALYSIS
Even if there was error, Williams is not entitled to a new trial if the error was harmless. See State v. Rossberg , 851 N.W.2d 609, 615 (Minn. 2014). Williams has the burden of showing that the district court abused its discretion in either its discovery or evidentiary rulings and that any erroneous ruling was prejudicial. See id. ; State v. Wildenberg , 573 N.W.2d 692, 696-98 (Minn. 1998). Because the alleged errors were non-constitutional, Williams must demonstrate "a reasonable possibility that the alleged error substantially affected the verdict." State v. Fraga , 898 N.W.2d 263, 273 (Minn. 2017) (citation omitted). When determining whether the defendant established a reasonable possibility that the erroneous admission of evidence substantially affected the verdict, "we consider whether the district court provided the jury a cautionary instruction, *366 whether the State dwelled on the evidence in closing argument, and whether the evidence of guilt was strong." Id. at 274.
The district court provided cautionary instructions to the jury regarding both the deposition and the December 2 incident. The State did not directly reference the deposition during closing argument and made only a brief reference to the December 2 incident. The evidence of guilt was very strong. In addition to the evidence from the December 2 incident and S.L.'s deposition, the State's case included J.S.'s testimony, the testimony of the other witnesses, the shell casings found in the car at the residence where Williams was arrested, the DNA results, the cell phone location evidence, the text messages, and Williams's own statement in the squad car. After considering the cautionary instructions provided to the jury, the State's limited use of the evidence in closing argument, and the strong evidence of guilt, we conclude that Williams has failed to demonstrate a reasonable possibility that any of the alleged errors substantially affected the verdict. Accordingly, Williams is not entitled to a new trial.
Williams also alleges that even if, considered individually, the erroneous admission of the deposition transcript and the evidence of the prior incident are not sufficient to justify a new trial, the "cumulative effect" of these errors denied him a fair trial. "An appellant may be entitled to a new trial in rare cases where the errors, when taken cumulatively, have the effect of denying [the] appellant a fair trial. When considering a claim of cumulative error, we look to the egregiousness of the errors and the strength of the State's case." Fraga , 898 N.W.2d at 278 (citations omitted) (internal quotation marks omitted). Where the evidence of guilt is strong, and the case is not "close factual[ly]," we are less inclined to order a new trial for cumulative error. See id. at 279.
Here, the State had an extremely strong case against Williams and the alleged errors were not egregious. As a result, we conclude that even if the district court erred in its discovery and evidentiary rulings, the cumulative effect of the alleged errors did not deny Williams a fair trial, and accordingly he is not entitled to a new trial.
CONCLUSION
For the foregoing reasons, we affirm Williams's convictions.
Affirmed.

Williams does not argue that the taking of the deposition was harmful by itself. Instead, he claims he was harmed by the admission of the redacted deposition transcript.

See Minn. R. Crim. P. 21.01(a) (allowing the court to order the oral deposition of a witness when there is a "reasonable probability that the testimony of the prospective witness will be used at hearing or at trial under any of the conditions specified in Rule 21.06, subd. 1"); 21.06, subd. 1(b) (allowing use of all or part of a deposition as substantive evidence at trial when "the party offering the deposition has been unable to obtain the attendance of the witness by subpoena, order of court, or other reasonable means").

By agreement of all relevant parties, numerous items were redacted from the transcript to avoid causing confusion or bias.